673 F.2d 671
 Dr. Philip B. EATOUGH, Jr., Appellant,
v.
Dr. Edwin H. ALBANO, Dr. Ruth S. Ballou, Dr. Clarence
Bookbinder, Dr. Jordan D. Burke, Dr. Enio J. Calluori, Dr.
Arnold E. Cianciulli, Dr. Thomas C. De Cecio, Dr. Rudolph T.
De Persia, Dr. Irving H. Plain, Dr. Joseph A. Riggs, Dr.
James M. Rosser, Nicholas A. Sidoti, Theodore Simkin, Dr.
Richard G. Stefanacci, Dr. Carl N. Ware, individually and as
members of the New Jersey State Board of Medical Examiners.
 No. 81-1717.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 1, 1981.
Decided March 1, 1982.
As Amended March 8, 1982.
 
 Melvin L. Wulf (argued), Clark, Wulf & Levine, Abraham Greenspan, New York City, for appellant.
 James R. Zazzali, Atty. Gen. of New Jersey, Ermine L. Conley, Asst. Atty. Gen., Joan D. Gelber, Deputy Atty. Gen. (argued), Trenton, N. J., for appellees.
 F. Dennis Nelson, John G. Campbell, Peterson, Ross, Schloerb & Seidel, Chicago, Ill., for the amicus curiae American Osteopathic Ass'n.
 Kent D. Kehr, Clayton, Mo., for amicus curiae American Ass'n of Colleges of Osteopathic Medicine.
 Before GIBBONS, WEIS and GARTH, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 This appeal presents a federal constitutional and a state statutory challenge to certain regulations and practices of the New Jersey Board of Medical Examiners regarding the licensing of physicians. These regulations and practices have prevented the appellant, Dr. Philip B. Eatough, Jr., a Doctor of Osteopathy (D.O.) and Board licensed physician, from holding himself out to the public as an M.D. Eatough contends that this results in a violation of the United States Constitution and of the New Jersey statutes governing medical practice. The district court rejected these claims. We affirm.
 
 
 2
 * Osteopathy, as a distinct approach to medical treatment, arose in the latter part of the nineteenth century in the mid-western United States.[1] The osteopathic approach-as opposed to allopathy, the more widespread approach adopted by the majority of physicians in this and other countries-stresses a view of the human organism as a self-regulating and self-healing whole. In emphasizing the interdependence and interrelatedness of bodily systems, osteopathy tends to employ surgery and drug treatments less frequently than does allopathy. Instead, there is a more frequent use of techniques of "bio-mechanics" to manipulate the neuromusculoskeletal system in order to return the various bodily systems to their naturally harmonious state.
 
 
 3
 There are presently fourteen osteopathic medical schools in the United States, all accredited by the American Osteopathic Association. The parties have stipulated that accredited osteopathic schools provide medical education equal in substance and quality to that provided by non-osteopathic schools. The subjects taught, and the content of those subjects, are the same in both types of schools (with equal numbers of classroom hours in the basic sciences and clinical work), except that osteopathic medical students are required to take, in addition, courses in osteopathic theory and manipulation (which courses may be electives in non-osteopathic schools). In New Jersey, for example, students of the Rutgers Medical School and those of the New Jersey School of Osteopathic Medicine (both are part of the University of Medicine and Dentistry of New Jersey) attend the same classes and labs in basic sciences for the first two years, while students in the latter are also required to take courses in osteopathic manipulation.
 
 
 4
 Manipulative medicine is practiced and is the subject of textbooks by both M.D.'s and D.O.'s. D.O.'s are on the faculties of many American medical schools that grant the M.D. degree, and D.O.'s are accepted with the approval of the American Medical Association (A.M.A.) into internships and residencies in A.M.A. approved hospitals. D.O.'s presently may join, and are members of, county and state medical societies as well as the A.M.A.
 
 
 5
 Licensing of persons to practice medicine in New Jersey is governed by the New Jersey Medical Practices Act, N.J.Stat.Ann. §§ 45:9-1 to 9-27.9. (West 1978). Statutory licensing requirements, Sections 9-6 to 9-14, are the same for all current applicants (regardless of medical school attended) and do not distinguish between graduates of allopathic and osteopathic schools for licensing purposes. New Jersey legislative policy has been to recognize graduates of osteopathic medical schools as fully competent in every respect to practice medicine and surgery.[2]
 
 
 6
 Under Section 9.2, the State Board of Medical Examiners "shall make and adopt all necessary rules, regulations and bylaws not inconsistent with the laws of the State or of the United States, whereby to perform the duties and to transact the business required under the provisions of this article (section 45:9-1 et seq.)." Eatough objects to a practice of the Board and to two related rules promulgated by it. The Board's practice has been to issue the same license to all physicians (regardless of what medical school they attended), but to add the suffix D.O. to the names of all graduates of osteopathic medical schools, while employing M.D. for the graduates of other medical schools. There is no express statute or rule that authorizes the inscription of these suffixes on the license of any physician in New Jersey. A "Degree designation" rule passed in 1971 reads:
 
 
 7
 A physician licensed to practice medicine and surgery in the State of New Jersey shall identify himself only by that degree designation (M.D. or D.O.) which imprinted (sic) on the license issued to said person by the board; for example, John Doe, M.D., Joe Doe, O.D. (sic), Dr. John Doe, M.D. or Dr. John Doe, D.O.
 
 
 8
 N.J.A.C. 13:35-4.1. And a rule governing "Provision of information to the public" passed in 1978 provides, in pertinent part:
 
 
 9
 A licensee in the State of New Jersey may provide information to the public, by publication in a dignified manner in newspapers or comparable written publications concerning: education, certification or appointment, location and availability of services, fees for routine professional services and other pertinent information about the licensee's practice. On any such publication, license degree must be designated....
 
 
 10
 N.J.A.C. 13:35-6.13(b).
 
 
 11
 In addition to his challenge of this practice and related rules, Eatough objects to the way the Board has chosen to treat graduates of foreign medical schools (FMG's). FMG's may receive a license in much the same way as graduates of schools in this country: e.g., by passing the Federation Licensing Examination (FLEX) (N.J.A.C. 13:35-3.1), or by endorsement after being first licensed to practice in another state (N.J.A.C. 13:35-3.2 and 3.3). See N.J.Stat.Ann. § 45:9-8.[3] Although the Board may have no specific information concerning the medical education at these foreign schools, when it issues medical licenses to FMG's, the Board imprints the M.D. suffix.
 
 
 12
 Eatough graduated from the Philadelphia College of Osteopathic Medicine with the degree of Doctor of Osteopathy in 1971. He thereafter completed a one year internship and two year residency in internal medicine at St. Michael's Medical Center in Newark, New Jersey. In April of 1972, he was licensed to practice medicine and surgery in the State of Missouri, and in 1973, he was licensed by endorsement of his Missouri license to practice in New Jersey. He has also become a Diplomate in Internal Medicine, certified by the American Board of Internal Medicine in 1976, and a Diplomate in Cardiovascular Diseases, having passed all required exams of the American Board of Cardiovascular Diseases by 1979. He is affiliated with two A.M.A. hospitals in New Jersey: Riverview in Red Bank and St. Michael's Medical Center in Newark. His practice is limited to the two specialties for which he has been trained: internal medicine and cardiovascular diseases.
 
 
 13
 Eatough asserts that he never has and does not presently employ any osteopathic manipulative techniques or principles in his practice. When he first began to practice, he used the degree designation D.O., but after coming to believe that the public did not perceive him to be a qualified physician, he substituted the M.D. suffix in his practice (e.g., in the telephone directory and on office signs). When he made a written request through his attorney that a new medical license be issued to him with the M.D. suffix thereon, however, the Board refused.
 
 
 14
 In March of 1979, two of Eatough's patients wrote the Board to inquire whether appellant was an M.D. or an Osteopath and informed the Board that appellant was using the M.D. suffix. Although the Board responded that, as a Doctor of Osteopathy, appellant held the same license as an M.D. with all the rights and privileges to practice medicine and surgery in New Jersey, these two patients stopped seeking his services.
 
 
 15
 Following this correspondence, the Board wrote to inform Eatough that he was violating their Degree Designation rule and that he was subject to discipline unless he ceased using the M.D. suffix. Fearful of loss of his license and a fine, he sent the Board a letter of compliance, but continued to use the designation M.D. When the Board learned of this, it wrote him another letter, giving him thirty days to correct all materials used in his practice identifying him as an M.D. Eatough still refused to comply, and filed this suit in the district court on May 14, 1979.
 
 
 16
 Eatough's complaint alleges violations of his federal constitutional rights under the first amendment, and under the due process and equal protection clauses of the fourteenth amendment, as well as violations of the New Jersey Medical Practices Act. The district court found against him on all his claims. On appeal he asserts only his equal protection claim and certain state statutory claims.
 
 II
 
 17
 Eatough raises two state law claims. First he argues that the rules cited earlier concerning degree designation and providing information to the public contravene the Medical Practices Act which provides:
 
 
 18
 Any person shall be regarded as practicing medicine and surgery, within the meaning of this chapter, who shall use the words or letters "Dr.", "doctor", "professor", "M.D.", or "M.B." in connection with his name, or any other title intending to imply or designate him as a practitioner of medicine or surgery in any of its branches, and who, in connection with such title or titles, or without the use of such titles, or any of them, holds himself out as being able to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical condition, or who shall either offer or undertake by any means or methods to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical condition. The provisions of this chapter shall apply to all persons professing and attempting to cure disease by means of the so-called system of "faithcurism", "'mind-healing", "laying-on-of-hands", and other similar systems.
 
 
 19
 N.J.Stat.Ann. § 45:9-18 (West 1978). The fact that this section makes reference to people practicing medicine without the use of titles in no way implies that such behavior must be allowed. As the last sentence of the section makes clear, the purpose of the section is to subject all persons acting like physicians to the requirements of the Act, including the licensure requirements. Thus the promulgation by the Board of the rules at issue does not conflict with this section.
 
 
 20
 Eatough also argues that the challenged rules contravene the Act by authorizing forms of advertising not allowed by N.J.Stat.Ann. § 45:9-16(j). The Board counters by pointing to a 1978 amendment to the Act specifically permitting:
 
 
 21
 A directory of physicians for consumer use which shall include the educational background, degrees, fellowships, certifications, specialties, experience and any other pertinent information which is related to the practice of medicine and surgery of the physicians.
 
 
 22
 N.J.Stat.Ann. § 45:9-16(j)(g) (West Supp.1981-82).
 
 
 23
 We fail to understand Eatough's challenge in this respect to the "Degree designation" rule, N.J.A.C. 13:35-4.1. Specifying that a licensed physician "shall identify himself only by" a certain degree designation does not itself authorize any form of advertising.
 
 
 24
 While we do understand Eatough's argument with respect to the rule concerning advertising, N.J.A.C. 13:35-6.13(b), we need not decide whether, for example, the newspaper advertising permitted by that rule can be interpreted to fall within the language of the 1978 amendment to the Act. Eatough's argument amounts to a contention that because the rule contravenes the statute in some respect, it must be considered a nullity with no application to anyone, including himself. Implicit in this argument is the contention that the rule cannot be limited or severed in such a way so as to make its application to him valid. Eatough, however, has offered no reason why we should declare a state regulation void when its application to him-i.e., preventing any advertising by him without a D.O. designation-is otherwise valid. Without any indication that New Jersey case law prohibits severability, there is no reason why we should enjoin the rule's otherwise valid application to him.
 
 III
 
 25
 Our rejection of his State law claims requires that we address Eatough's constitutional claims. He contends that the Board has violated the equal protection clause in two respects. On the one hand, it is urged that the Board's practice and regulations requiring appellant to employ only D.O. when holding himself out to the public as a physician constitutes an arbitrary and irrational form of discrimination between holders of M.D. degrees and holders of D.O. degrees that does not further any legitimate state interest. Secondly, Eatough contends that the Board's policy of issuing M.D. licenses to FMG's (and thus allowing them to hold themselves out as M.D.'s) arbitrarily favors FMG's over holders of D.O. degrees.
 
 
 26
 It is long settled that states have a legitimate interest in regulating the practice of medicine. See, e.g., Bigelow v. Virginia, 421 U.S. 809, 827, 95 S.Ct. 2222, 2235, 44 L.Ed.2d 600 (1975); Lambert v. Yellowley, 272 U.S. 581, 597, 47 S.Ct. 210, 214, 71 L.Ed. 422 (1926); Dent v. West Virginia, 129 U.S. 114, 122-23, 9 S.Ct. 231, 233-34, 32 L.Ed. 623 (1889). In this case, both the Board and the district court, No. 79-1421, Slip Op. at 9 (D.N.J. March 25, 1981), have articulated what is certainly a legitimate state interest purportedly served by the Board's practice and rules: allowing the public to make an informed choice among physicians.
 
 
 27
 The application of the equal protection clause in the context of such a legitimate interest has been discussed often, and recently, by the Supreme Court. Since no one contends that the Board's rules are burdening either a "suspect class" such as a racial or ethnic group or a "fundamental interest" such as voting-this being an example, rather, of ordinary social and economic regulation-the constitutional standard for assessing equal protection is concededly the "rational relation test." The Court's reluctance to overturn such legislative activity is exemplified in such recent articulations of this standard as "we will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational," Vance v. Bradley, 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979); and "the Equal Protection Clause is satisfied by our conclusion that the ... Legislature could rationally have decided that (the legislative means at issue) might foster (the concededly legitimate state purpose)" (emphasis in original), Minnesota v. Clover Leaf Creamery Co., 449 U.S. 457, 466, 101 S.Ct. 715, 725, 66 L.Ed.2d 659 (1981).[4]
 
 
 28
 Applying the rational relation test, the district court noted both that the distinction between osteopaths and allopaths was created not by the Board, but by the two schools of medicine; and that the parties were in agreement that some patients seek out D.O.'s precisely in order to obtain the manipulative treatment such physicians ordinarily offer. Slip Op. at 9. Since the Board's practice and rules distinguishing between M.D.'s and D.O.'s afford the public at least some aid in making their informed choices among physicians, we must concur with the district court, id., that there exists a rational relationship sufficient to pass muster under the equal protection clause. See also Oliver v. Morton, 361 F.Supp. 1262, 1268 (N.D.Ga.1973). That some physicians such as appellant may not offer the services that their degree designation would lead one to expect does not make the Board's rules irrational. Only where we had some reason to infer "antipathy," Vance, supra, 440 U.S. at 97, 99 S.Ct. at 943 on the part of the Board against D.O.'s, would we be inclined to demand a tighter "fit" between the means and ends in this case.
 
 
 29
 The district court held that the meager evidence offered by the appellant indicating the low esteem in which osteopaths may be held by the public was not convincing. Slip Op. at 10. Moreover the New Jersey legislative and Board policy is to afford graduates of osteopathic schools the same rights and privileges as M.D.'s. There is no reason on the record to subject the Board's actions to a stricter scrutiny than the rational basis standard of review requires.
 
 
 30
 Eatough also complains that the Board's practice of granting FMG's licenses with the M.D. suffix works an arbitrary discrimination with respect to D.O.'s. For this proposition, he cites Oliver v. Morton, supra, 361 F.Supp. at 1269, in which the district court explained that the Georgia Board's reasons for granting FMG's an M.D. license-that the foreign degree is substantially equivalent to the M.D. degree and that the names given most foreign degrees have little meaning to most people in Georgia-were nearly identical to the plaintiff's arguments in favor of being permitted to refer to himself as an M.D. rather than a D.O. Since the Georgia Board's policy was found to treat these similarly situated groups differently without a rational basis for that distinction, the court enjoined the Board from refusing to issue the plaintiff a license bearing the M.D. designation so long as they granted such licenses to foreign-trained physicians without M.D. degrees.
 
 
 31
 The district court declined to follow the Oliver court on this point, Slip Op. at 9-10, and so do we. The Board's practice of issuing M.D. licenses to FMG's, but not to graduates of osteopathic schools, is a classification distinguishing between these two groups. Once again, however, the Board has explained that its purpose is to inform the public, and we cannot conclude that the means chosen are not rationally related to that end.
 
 
 32
 It is New Jersey policy to issue licenses to practice medicine to the graduates of foreign schools once they have passed certain examinations (e.g., the FLEX exam and an exam given by the Educational Commission on Foreign Medical Graduates). The wisdom of that policy is not at issue here. Medical schools around the world grant degrees with a large variety of names (e.g., Ireland-"M.B.B.S."; Norway-"Candidate in Medicine"; Spain-"Licentiate in Medicine & Surgery"). The Board policy of issuing M.D. licenses to all these graduates is rationally related to the purpose of allowing the public to make an informed choice among physicians, insofar as many of the foreign degree names might only serve to confuse those seeking a physician.[5] And since there are no FMG's eligible to practice in New Jersey that come from a school identified with osteopathy, rather than allopathy, the distinction between M.D.'s and D.O.'s is rational in light of the previously mentioned purpose to inform patients of those physicians with osteopathic training. See Maceluch v. Texas State Board of Medical Examiners, No. CA-3-77-1498-G (N.D.Tex. July 10, 1981).
 
 
 33
 We can sympathize with the situation of Dr. Eatough who, having decided to abstain from practicing according to principles of osteopathy, nevertheless must suffer from the misunderstanding of some numbers of the public concerning his educational background. We might conceivably even question the wisdom or fairness of not allowing him to hold himself out as an M.D. while permitting the graduates of foreign medical schools, whose programs may not have been thoroughly evaluated, to do so. Our role as a court applying the equal protection clause, however, is limited in this case to evaluating whether there is some reasonable basis for finding that the distinctions employed further a legitimate state purpose. Since we have concluded that such a rational basis exists, we cannot find that the Board's practice and rules violate his rights to the equal protection of the laws.
 
 IV
 
 34
 The judgment appealed from will be affirmed.
 
 
 35
 WEIS, Circuit Judge, dissenting.
 
 
 36
 As the majority points out, New Jersey's present legislative policy recognizes graduates of osteopathic medical schools as fully competent in every respect to practice medicine and surgery. This legislative policy was underscored nearly two decades ago by the New Jersey Supreme Court when it discredited "the notion that doctors of osteopathy are merely cultists and may not safely be permitted to associate with doctors of medicine...." Greisman v. Newcomb Hospital, 40 N.J. 389, 403, 192 A.2d 817 (1963). The defendants conceded in the district court that "each accredited osteopathic medical school provides medical education, which is equal in both substance and quality to that which is provided in a non-osteopathic medical school."[1]
 
 
 37
 In 1939, the legislature amended the Medical Practices Act so that "the practice of medicine and/or surgery shall be deemed to include, inter alia, the practice of osteopathy." N.J.Stat.Ann. § 45:9-5.1 (West 1978). The Board did not respond to the legislative judgment with ungrudging acceptance. Even though its authority is restricted to the issuance of a "license ... to practice medicine and surgery," N.J.Stat.Ann. § 45:9-16, the Board still requires that the degree designation of "M.D." or "D.O." be imprinted following the physician's name on each license-a practice not contemplated by the statute, or authorized by any rule.
 
 
 38
 The Board has compounded the discredited distinction between the two types of practitioners by enforcing a "Degree Designation Rule," N.J.A.C. 13:35-4.1, as well as an "Advertising Rule," N.J.A.C. 13:35-6.13. The former regulation provides that "a physician licensed to practice medicine and surgery in the State of New Jersey shall identify himself only by that degree designation (M.D. or D.O.) which imprinted (sic) on the license...." Similarly, Rule 13:35-6.13, which regulates advertising and solicitation, directs that in any publication providing information to the public, the physician designate his "license degree." Thus, the Board's licensing practice and rules perpetuate a distinction between allopathic and osteopathic physicians which the enabling statute does not authorize, and, indeed, was intended to eliminate.
 
 
 39
 As justification for its Advertising Rule, the Board cites the provisions of a 1977 New Jersey statute, N.J.Stat.Ann. § 45:9-16, in which the legislature specified approved forms of advertising by license holders and required that their "professional degree" be included in publications, listings and signs. This statute-whose constitutionality is doubtful because it restricts professional advertising, see In re R. M. J., --- U.S. ----, 102 S.Ct. 929, 71 L.Ed.2d 64 (U.S.1982)-supports a policy of requiring each licensee to disclose his "degree" to the public. Unlike the reference to "license degree" in Rule 13:35-6.13, the statute speaks of "professional degree." Since the legislature obviously has not delegated to the Board of Medical Examiners the power to confer professional degrees-an authority vested in institutions of higher learning, N.J.Stat.Ann. § 18A:3-1 et seq. (West 1978)-it is logical to conclude that the statutory phrase "professional degree" refers to a recognized academic degree.
 
 
 40
 Yet the Board has not observed this limitation. Foreign medical school graduates (FMGs), who have not been granted the academic degree of doctor of medicine, or who, in some cases, hold no professional academic degree at all, are issued licenses by the Board imprinted with the "M.D." suffix.
 
 
 41
 In defending its licensing practices for FMGs and osteopaths, the Board advances two arguments: (1) training in foreign schools is more akin to American medical schools than it is to osteopathic institutions, and (2) the public is entitled to know the background of licensees to whom it looks for health care.
 
 
 42
 The Board's position is seriously flawed. First, in trying to fit the schooling received by FMGs into the mold of either allopathic or osteopathic disciplines, the Board exceeds its statutory authority. As noted earlier, the statute only gives the Board the power to license individuals for the practice of "medicine and surgery." By unilaterally imposing the allopathic-osteopathic distinction on licenses issued, the Board is simply continuing the earlier invidious tradition of equating the status of a physician with an M.D. degree, a policy plainly contrary to the expressed legislative aim.
 
 
 43
 The purported justification that the public should have accurate information about the training of the licensee is inconsistent with actual practice. The Board's policy of licensing FMGs as M.D.'s, promotes deception, not disclosure, since it is conceded that many of the FMGs do not in fact hold an M.D. degree. Many foreign medical schools are of high quality, and the training their graduates receive compares favorably with that given in those American schools which award the M.D. or D.O. degree. But that is not universally true, and it is not denied that in some instances, foreign medical training does not meet American standards. Yet, under the Board's current practice, both those persons who graduate from an approved American medical school and those persons who have had foreign training-some of whom are not even graduates-receive the same "license degree."
 
 
 44
 The misleading nature of the designation is extended even further by the Board's rule on advertising, since it requires the physician to utilize his "license degree,"-not his "academic" or "professional" degree-on signs and in directories. Thus, the Board's practice with respect to the "license degree" conferred on FMGs does not inform the public but actually leads it to assume, erroneously, that the FMG was awarded an M.D. degree from an American medical school.[2]
 
 
 45
 The Board seemingly recognized the dubiety of its policy when in 1979 it proposed to change its degree designation practice. The proposed rule would have required that a licensee designate himself simply as authorized to practice medicine and surgery, or some specialty, e.g., "Dr. John Doe, licensed to practice medicine and surgery." FMGs would only be allowed to use such an identification. Graduates of American allopathic and osteopathic schools, who elected to do so, could use their academic degree, e.g., "John Smith, M.D." or "John Smith D.O.," as the case may be.
 
 
 46
 This proposal resulted in several hundred letters of protest. Not unexpectedly, most came from FMGs and students studying abroad who objected to the provision because it would prevent them from identifying themselves as "M.D.'s." In spite of the fact that the proposed rule conformed to legislative intent, the Board withdrew the proposal and has continued the old, objectionable practice.
 
 
 47
 Since the Supreme Court of New Jersey has not been called upon to decide the issue presented here, we must predict how that court would interpret the state's Medical Practices Act. It is conceded that there is no express authority for the Board's actions, and so its defense must rely on implied power. In assessing whether a particular administrative action has statutory authorization, "the reviewing court may look beyond the specific terms of the enabling act to the statutory policy sought to be achieved by examining the entire statute in light of its surroundings and objectives." New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562, 384 A.2d 795, 804 (1978); In re Suspension of Heller, 73 N.J. 292, 374 A.2d 1191 (1977). Any agency action is defective where it is not statutorily authorized or is arbitrary or unreasonable. 384 A.2d at 804. "(A) court is bound to override an administrative construction where it is clearly contrary to the plain meaning of the statute." Service Armament Co. v. Hyland, 70 N.J. 550, 562, 362 A.2d 13, 19 (1976); Kingsley v. Hawthorne Fabrics, 41 N.J. 521, 197 A.2d 673 (1964). See also, Ford Motor Credit Co. v. S. E. Barnhart & Sons, Inc., 664 F.2d 377 (3d Cir. 1981).
 
 
 48
 Some indication of the New Jersey Supreme Court's view of the Medical Practices Act may be gleaned from Greisman v. Newcomb Hospital, supra, and Falcone v. Middlesex County Medical Society, 34 N.J. 582, 170 A.2d 791 (1961). In Greisman, a licensed osteopath was excluded from the staff of a private hospital because of a by-law that limited staff admission to graduates of medical schools approved by the American Medical Association. The court held that the public interest and justice required rejection of the by-law as arbitrary. 192 A.2d at 825. Similarly, in Falcone, the court struck down a county medical society requirement that denied membership to an osteopath because he had not studied at a medical school approved by the AMA. 170 A.2d at 799.
 
 
 49
 These two cases demonstrate that the New Jersey Supreme Court has an overall commitment to the non-discrimination policy adopted in the Medical Practices Act. It appears to me, therefore, that the court would be strongly disposed to strike down the discriminatory licensing policy that the Board has pursued with respect to osteopaths and FMGs.
 
 
 50
 Because I find a statutory violation, I do not meet the constitutional issues discussed by the majority. We differ on the question of statutory interpretation presented here, and it is unfortunate that there are no governing New Jersey decisions to guide us. That is not an unusual situation, however, and occurs all too frequently when litigants rush to the federal courts with a constitutional attack before fully exploring the state law issues. Resort to the state court in the first instance here might well have yielded an authoritative decision on state law, making a federal constitutional challenge unnecessary.[3] Litigants should remember that we are to approach constitutional issues only after state grounds have been exhausted. Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). Indeed in this case the district court might well have considered whether Pullman abstention was in order. See Babbitt v. United Farm Workers National Union, 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); Railroad Commission of Texas v. Pullman, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).
 
 
 51
 Because I am convinced that the Board acted in excess of its powers and contrary to the enabling statute, I would reverse the judgment of the district court.
 
 
 
 [1]
 The parties submitted the case to the district court on a set of stipulated facts and agreed that all depositions, interrogatories and exhibits would be made part of the record
 
 
 [2]
 See N.J.Stat.Ann. §§ 45:9-5.1, 9-13. This contrasts with the New Jersey statutory prohibition on holders of licenses to practice osteopathy-as opposed to licenses to practice medicine and surgery-from prescribing or administering drugs and from performing surgery. N.J.Stat.Ann. § 45:9-14.3. Section 9-14.3, while not repealed, is no longer applicable to osteopaths licensed to practice medicine and surgery
 
 
 [3]
 There is also a so-called "Fifth Pathway" program designed to permit a select number of United States citizens studying in foreign schools who leave after completing all of the required courses there, but without receiving a medical degree, to do a fifth year in an A.M.A. approved hospital here. After this fifth year of additional clinical training, these students may enter an approved internship and then take the FLEX exam
 
 
 [4]
 It is not the case, as Eatough argues, that the defendants are confined to relying upon "articulated" purposes in fact underlying the statute. In U.S. R.R. Retirement Bd. v. Fritz, 449 U.S. 166, 178, 101 S.Ct. 453, 460, 66 L.Ed.2d 368 (1980), the Court stated that "this Court has never insisted that a legislative body articulate its reasons for enacting a statute." Cases cited by appellant do not support the converse: Johnson v. Robison, 415 U.S. 361, 376, 94 S.Ct. 1160, 1170, 39 L.Ed.2d 389 (1974) (Congress had, as is usually not the case, revealed its express objectives and no other objective was claimed); McGinnis v. Royster, 410 U.S. 263, 277, 93 S.Ct. 1055, 1063, 35 L.Ed.2d 282 (1973) (district court ordered not to discard a clear and legitimate purpose when it had perceived another purpose to be primary and found an equal protection violation based upon that purpose)
 Nor is it the case, as Eatough also urges, that the purported purpose must be rejected if the challenged classification is a poor means of attaining it. The case they cite, Orr v. Orr, 440 U.S. 268, 280 n.10, 99 S.Ct. 1102, 1112 n.10, 59 L.Ed.2d 306 (1979), involves a discussion of the more severe "substantially related" requirement found in gender discrimination cases.
 
 
 [5]
 Neither the factual accuracy of this reasoning, nor its political wisdom, is for us to question. As the Supreme Court stated recently in Clover Leaf Creamery, supra, 449 U.S. at 463, 101 S.Ct. at 723
 But States are not required to convince the courts of the correctness of their legislative judgments. Rather, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." Vance v. Bradley, supra, 440 U.S. at 111, 99 S.Ct. at 949.
 
 
 [1]
 The district court observed, "the New Jersey College of Osteopathic Medicine and the New Jersey College of Medicine share the same facilities for instruction in the basic sciences during the first two years. They share the same rooms, labs, and instructors, and the examinations are the same."
 
 
 [2]
 The record shows that two patients left Dr. Eatough because he had a D.O. degree, rather than an "M.D." designation. Clearly, then, he suffers harm under the board's policy because a member of the public might be led to consult an FMG whose training was inferior, but who is permitted-indeed required-to designate himself as an "M.D."
 
 
 [3]
 The parties have relied upon Oliver v. Morton, 361 F.Supp. 1262 (N.D.Ga.1973), and Maceluch v. Texas State Bd. of Med. Examiners, No. CA-3-77-1498-G (N.D.Tex. July 10, 1981). In the latter case the court was called upon to construe a state statute and thus it is not pertinent to the legitimacy of the administrative regulation here. In Oliver, plaintiffs attacked a practice of the state Board of Medical Examiners, similar to the one challenged here, as not consonant with state law. Rather than reaching the issue of whether the regulation complied with the state statute-a question about which it had substantial doubt-the court decided that there had been a constitutional violation. Cf. Siler v. Louisville & Nashville R.R. Co., 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909)