Dr. Rudolph F. PROCARIO, Jr., Dr. Frederic Haberman, Dr. Marvin L. Ebert and Dr. Marvin S. Watsky, Plaintiffs,

v.

Gordon M. AMBACH, Individually and as Commissioner of Education of the State of New York, et al., Defendants.

No. 79–CV–283.

United States District Court, N.D. New York.

March 22, 1983.

---

Abraham Greenspan, New York City, for plaintiffs.

Robert Abrams, Atty. Gen. of the State of N.Y., Albany, N.Y., for defendants; Lawrence Doolittle, Asst. Atty. Gen., Albany, N.Y., of counsel.

## MEMORANDUM–DECISION and ORDER

MINER, District Judge.

### I

Plaintiffs, Doctors of Osteopathy licensed to practice medicine and surgery in the State of New York, bring this action for declaratory judgment against defendants, the Commissioner of Education and the Board of Regents of the State of New York, pursuant to 42 U.S.C. § 1983, contending that the failure of the defendants to grant them the degree of Doctor of Medicine constitutes a denial of equal protection of the laws. Jurisdiction in this Court is predicated upon the provisions of 28 U.S.C. § 1343(3), 28 U.S.C. § 2201 and 28 U.S.C. § 2202. The matter has been submitted for final determination by the Court pursuant to a stipulation of relevant and material facts dated November 30, 1982, a stipulation of facts not considered material or relevant by the defendants dated November 22, 1982 and certain documents and exhibits.

### II

Each plaintiff is a graduate of a medical school authorized to grant the degree of Doctor of Osteopathy (D.O.). These medical colleges provide medical education in osteopathic principles and techniques [1] as well as in all subjects taught in non-osteo-

---

1. Osteopathy is defined as

  .   .   .   .   .

2. a system of therapy founded by Andrew Taylor Still (1828–1917) and based on the theory that the body is capable of making its own remedies against disease and other toxic conditions when it is in normal structural relationship and has favorable environmental conditions and adequate nutrition. It utilizes generally accepted physical, medicinal, and surgical methods of diagnosis and therapy, while placing chief emphasis on the importance of normal body mechanics and manipulative methods of detecting and correcting faulty structure.

*Dorland's Illustrated Medical Dictionary* 943 (26th ed. 1981).

pathic medical schools.[2] Graduates of the latter schools are awarded the degree of Doctor of Medicine (M.D.) in the United States. Foreign medical colleges award medical degrees bearing various designations,[3] but no foreign medical college awards the D.O. degree. Licenses to practice medicine and surgery granted by the State of New York following the completion of training requirements and examinations make no reference to the degree held by the licensee. Indeed, certain holders of these licenses are American citizens who hold no degree, having attended foreign medical schools without completion of degree requirements and having returned to the United States for completion of training under a program known as the "Fifth Pathway."[4]

In 1977, Section 6529 was added to the New York State Education Law[5] to allow the Board of Regents to confer the M.D. degree upon all physicians not holding that degree who are licensed to practice medicine in the State of New York, including those licensed under Section 6524 and those licensed under Section 6528 of the Education Law.[6] Section 6529 was enacted in its present form in two stages, the first stage authorizing conferral of the M.D. degree on "Fifth Pathway" licensees who are licensed under Section 6528 and the second authorizing conferral of the degree on foreign medical school graduates licensed under Section 6524.[7] In spite of the clear legislative intent expressed in the titles of the two acts and in the legislative history,[8] it is noteworthy that the statute authorizes the award of the M.D. degree to *any* physician, ostensibly including osteopaths licensed under Section 6524. Shortly after the enactment of Section 6529, the Department of Education adopted a regulation, 8 NYCRR 3.57, implementing the statute and establishing requirements for the granting of the M.D. degree as follows:

(a) completion of a medical education program in a foreign medical school satisfactory to the department which does not grant the degree of doctor of medicine (M.D.) and in which the philosophy and

2. The non-osteopathic schools teach the principles and techniques of allopathy, defined as a "term applied to that system of therapeutics in which diseases are treated by producing a condition incompatible with or antagonistic to the condition to be cured or alleviated." *Dorland's Illustrated Medical Dictionary, supra,* at 50.

3. Foreign degrees include "Bachelor of Medicine," "Physician," "M.B.B.S." (Bachelor of Medicine, Bachelor of Surgery), "Physician and Surgeon", "License in Medicine" and "Diploma of Physician" as well as "M.D." In some foreign countries medical students receive a license to practice but no medical degree upon graduation.

4. "Fifth Pathway" training qualifies those who complete it to take the appropriate examination for licensure.

5. New York Education Law § 6529 provides in part:

Notwithstanding any provision of law to the contrary, the board of regents is authorized, in its discretion, to confer the degree of doctor of medicine (M.D.) upon physicians who are licensed pursuant to section sixty-five hundred twenty-four or section sixty-five hundred twenty-eight of this chapter and have practiced medicine in the state of New York for at least three years subsequent to receiving such license provided, however,

that a fee of fifty dollars shall be paid by each applicant to the education department for the issuance of such degree.

6. Section 6524 deals with the training and examination requirements leading to licensure of those holding doctor of medicine, doctor of osteopathy and equivalent foreign medical degrees. Section 6528 relates to the training and examination required of those desiring licensure under the "Fifth Pathway" program.

7. Chapter 242 of the Laws of 1977, effective June 7, 1977, is entitled "AN ACT to amend the education law, in relation to authorizing the conferral of the degree of doctor of medicine on certain physicians educated in foreign medical schools." This act pertained only to those licensed under Section 6528. Chapter 465 of the Laws of 1977, effective August 1, 1977 is entitled "AN ACT to amend the education law in relation to authorizing the conferral of the degree of doctor of medicine on certain physicians who have graduated from foreign medical schools not granting the degree of doctor of medicine." This act extended the authorization for degree conferral to all those licensed under Section 6524.

8. *See e.g.,* Governor's Memorandum of Approval of Chapter 242, dated June 7, 1977.

curriculum were equivalent as determined by the department, in accordance with the policy of the Board of Regents to those in programs leading to the degree of doctor of medicine (M.D.) at medical schools in the United States satisfactory to or registered by the Board of Regents and the department. . . .

Plaintiffs challenge that regulation in this action, since they do not meet the criteria set forth in the regulation and are excluded by its terms from eligibility for the degree of Doctor of Medicine. Plaintiffs apparently also challenge Section 6529 to the extent that it precludes conferral upon them of the M.D. degree.

### III

Plaintiff Rudolph F. Procario was awarded the D.O. degree by the Philadelphia College of Osteopathic Medicine and has been licensed to practice medicine and surgery in New York since 1956. After completing an approved residency in psychiatry at the Mt. Sinai Hospital in New York City, he served for one year as chief resident in psychiatry at the City Hospital Center in Queens, New York. He was employed thereafter as a psychiatrist at the Bronx Psychiatric Center and currently is employed as the admissions psychiatrist at the Manhattan Psychiatric Center. Plaintiff Procario is a member of the American Medical Association and various other medical societies and holds membership in the American Psychiatric Association and other organizations related to his specialty.

Dr. Frederic Haberman, the second named plaintiff, was graduated from the Kansas City College of Osteopathic Medicine, completed an approved residency in Dermatology at the Albert Einstein College of Medicine and is Board Certified in Dermatology. Before entering upon his dermatology residency, Dr. Haberman was engaged in family practice and was Board Certified in that specialty. Licensed to practice in New York since 1969, Dr. Haberman has been a medical examiner for the Federal Aviation Administration since 1970. He is affiliated with a number of hospitals and serves as clinical instructor in dermatology on the faculty of the Albert Einstein College of Medicine.

Plaintiff Marvin L. Ebert was licensed to practice in New York in 1968 following his graduation from the Kirksville College of Osteopathic Medicine. He has practiced family medicine during his entire career and, for the past six years, he has been the Medical Director of two medical groups in the South Bronx. In this capacity, he supervises all medical services performed by the physicians affiliated with the groups. Both medical groups serve poor and minority patients residing in the South Bronx area.

Dr. Marvin S. Watsky, the fourth named plaintiff, received his D.O. degree from the Kansas City College of Osteopathic Medicine. He served an internship at the United States Public Health Service Hospital at Staten Island and thereafter served as a public health service officer at the same hospital. Dr. Watsky was licensed to practice medicine and surgery in New York in 1971 and completed an approved residency in Dermatology at the Brooklyn Veterans Administration Hospital. He is an attending dermatologist at several hospitals on Long Island and is eligible for Board Certification in his specialty.

Each accredited osteopathic medical school provides education in osteopathic principles and techniques as well as in all subjects taught in non-osteopathic medical schools. Graduates of schools of osteopathy serve on the faculties of medical schools that grant the M.D. degree, are accepted for post-graduate training in residency programs approved by the American Medical Association and are Board Certified in many medical specialties in the same manner as those holding M.D. degrees. The principles and manipulative techniques of osteopathy are taught in a number of non-osteopathic medical schools and are applied in practice by some who hold the M.D. degree. Although each plaintiff was trained in these principles and techniques, none uses them in his practice.

## IV

In contending that they have been denied the equal protection of the laws, plaintiffs argue that their education and training are at least equal in quality to that of non-osteopathic medical graduates. In support of that argument they refer to the successful position taken by defendants in *New York State Osteopathic Society v. Allen,* 26 N.Y.2d 20, 308 N.Y.S.2d 342, 256 N.E.2d 510 (1970). There the plaintiff sought to compel the Board of Regents to remove the M.D. degree designation from the licenses of fifty New York licensed D.O.s who were graduates of the former College of Osteopathic Physicians and Surgeons in California. Enabling legislation in California authorized this school to become the California College of Medicine and to award the M.D. degree. In addition, those physicians already holding the D.O. degree from that institution, including the fifty licensed in New York, were awarded the M.D. degree. Holding that the previously licensed D.O.s were entitled to use the M.D. designation, the New York Court of Appeals concluded that there was sufficient reason to recognize the M.D. degree conferred by the California School, since the medical education provided in osteopathic schools is at least equal to that provided in non-osteopathic schools recognized by the defendants.[9]

In further support of their equal protection claim, plaintiffs argue that their education and training are superior to the education and training of foreign medical school graduates entitled to receive the M.D. degree at the hands of defendants.[10] Plaintiffs assert, however, that a physician who does not hold an M.D. degree is perceived by the public to be inferior or less qualified than one who does. Moreover, plaintiffs allege that their

> failure to have and be able to use 'M.D.' degree designation in their respective practices and their failure to be listed as an 'M.D.' in the New York State Medical Directory of Physicians and in the Yellow Pages of the telephone directory prvents [sic] plaintiffs from receiving the referral of patients that they would otherwise receive from other physicians and patients who use the Directory and Yellow Pages as a source for finding a specialist in the field of medicine in which plaintiffs practice.

(Complaint, ¶ 70.)

Defendants contend that there is a rational distinction between foreign medical graduates and American medical graduates holding the D.O. degree, since there is a real difference between the medical education and training of osteopaths and that of allopaths. Defendants argue that the different types of schools in the United States are accredited by different agencies and under different standards and that schools of osteopathy require substantial instruction in osteopathic principles and techniques while non-osteopathic schools do not. With respect to *New York State Osteopathic Society v. Allen, supra,* defendants argue that they were constrained to recognize the conferral of the M.D. degree upon previously graduated osteopaths by the California School of Medicine "because of the compulsion of recognizing a sister state's statutory authority and the doctrine of full faith...." (Defendants' brief, P. 12.)

---

9. Indeed, although we do not question the petitioner's claim that it is acting in what it considers to be the best interests of the osteopathic profession, the entire thrust of its argument appears to be that persons trained in osteopathic institutions are somehow less qualified as physicians than those trained in medical schools. This position is not only contrary to the stipulated facts but goes against the express legislative policy of this State, which is to recognize such persons as fully competent in every respect, to practice medicine and surgery.
*New York State Osteopathic Society v. Allen, supra,* at 27, 308 N.Y.S.2d 342, 256 N.E.2d 510.

10. Exhibits submitted by the plaintiffs, consisting of studies and reports referred to on pp. 16 and 17 of plaintiffs' brief, establish rather conclusively the poor quality of foreign medical training by American standards, especially in clinical medicine. Apparently, this has become a matter of increasing concern to American medical authorities and has resulted in a requirement by defendants that foreign medical graduates have more post graduate medical training than American M.D.s or D.O.s prior to licensure.

## V

■ The Equal Protection Clause commands that "all persons similarly circumstanced shall be treated alike." *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920). However, "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner v. Texas,* 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1947). The initial discretion to determine classifications resides with the states and they "must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill." *Pyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). Therefore, in applying the Equal Protection Clause "to most forms of state action, we . . . seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose." *Id.*

■ The standard for review here, then, is whether there is a "rational basis" for the classification in question.[11] *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979); *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976). The rational basis test requires that state regulatory action be rationally related to the accomplishment of a legitimate state purpose based on promotion of the public welfare, health or safety. *See, e.g., Rinaldi v. Yaeger,* 384 U.S. 305, 309–10, 86 S.Ct. 1497, 1499–1500, 16 L.Ed.2d 577 (1966). Moreover, a state classification should not be overturned on equal protection grounds "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Barry v. Barchi,* 443 U.S. 55, 67, 99 S.Ct. 2642, 2650, 61 L.Ed.2d 365 (1979), quoting *Vance v. Bradley, supra,* 440 U.S. at 97, 99 S.Ct. at 942. Even where there is some evidence that a regulatory scheme is irrational, a denial of equal protection cannot be found where it appears that the issue is debatable. *United States v. Carolene Products Co., supra,* 304 U.S. at 154, 58 S.Ct. at 784.

■ Here, in pursuit of its legitimate interests in regulating the practice of medicine, the State of New York has demonstrated a rational interest in maintaining a distinction between physicians whose education has included substantial training in the manipulative theories and practices of osteopathy and those whose medical education has not included such training. *Maceluch v. Wysong,* 680 F.2d 1062 (5th Cir.1982); *Eatough v. Albano,* 673 F.2d 671 (3d Cir.1982), *cert. denied,* —— U.S. ——, 102 S.Ct. 2931, 73 L.Ed.2d 1331. There is no question that only osteopathic schools require substantial instruction in osteopathic principles and techniques and that those schools are accredited by agencies different from those that accredit schools of allopathic medicine. (Stipulation of relevant and material facts, ¶¶ 14, 15, 17). With respect to foreign medical graduates and "Fifth Pathway" physicians licensed to practice in New York, it appears that there are no foreign osteopathic schools and no foreign schools that grant the D.O. degree. (Stipulation, ¶¶ 10–12). Foreign medical graduates and trainees, therefore, whatever the quality of their

---

**11.** Plaintiffs do not allege that "fundamental rights" arising under the Constitution or invidious discrimination involving "suspect classes" are implicated in the state's regulatory scheme. Therefore, this Court is not required to implement the more restrictive "strict scrutiny test." *See San Antonio School District v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1293, 36 L.Ed.2d 16 (1973); *Graham v. Richardson,* 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971). *See also Harper v. Virginia Bd. of Elections,* 383 U.S. 663, 667, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169 (1966); *Reynolds v. Sims,* 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964); *United States v. Carolene Products Co.,* 304 U.S. 144, 152–153, n. 4, 58 S.Ct. 778, 783–784 n. 4, 82 L.Ed. 1234 (1938). Nor is this a case where "intermediate" scrutiny, the so-called "middle-tier" test, is applicable. *See Lalli v. Lalli,* 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

training may be, are not instructed generally in the principles of osteopathy. Plaintiffs' contention that the distinction between D.O.s and M.D.s in New York has been eliminated as a result of the decision in *New York Osteopathic Society, supra,* is rejected. There, as the result of action taken by the California College of Medicine, the State of New York issued "new licenses containing the legend, '*D.O.*, M.D.'" *Id.* 26 N.Y.2d at 24, 308 N.Y.S.2d 342, 256 N.E.2d 510 (emphasis supplied).[12] The State consistently has maintained a distinction between osteopaths and allopaths for the benefit of consumers of medical services and, therefore, it cannot be said that the classification bears no fair relationship to any legitimate public purpose. Accordingly, the Clerk is directed to enter judgment for the defendants.

The foregoing constitutes the Findings of Fact and Conclusions of Law required by Fed.R.Civ.P. 52(a).

It is so Ordered.

---

12. At present, licenses issued by the State of New York to practice medicine and surgery contain no designation of academic degree. This, of course, cannot be construed to mean that all those licensed as physicians and surgeons were trained in the same manner.