Dr. Richard T. **OLIVER**

v.

Dr. William J. **MORTON**, President of the Composite State Board of Medical Examiners of Georgia, et al.

Civ. A. No. 17489.

United States District Court, N. D. Georgia, Atlanta Division.

July 9, 1973.

Johnson, Harper, Daniel, Ward & Stanfield, Atlanta, Ga., for plaintiff.

Arthur K. Bolton, Atty. Gen., Roberts O. Bennett, Asst. Atty. Gen., Atlanta, Ga., for defendants.

Before MORGAN, Circuit Judge, and EDENFIELD and FREEMAN, District Judges.

## ORDER

RICHARD C. FREEMAN, District Judge:

Consideration of this case has proved to be an educational experience for the court. While the court is sensitive to the ignorance and bias which the plaintiff has encountered in the practices of his profession, we believe that his remedy lies chiefly in a concerted effort by him and other osteopaths to educate the public and those professional associations purporting to aid the professions and the public.

The plaintiff, Dr. Richard T. Oliver, is fully licensed to practice medicine in the State of Georgia and holds the academic degree of Doctor of Osteopathy (D.O.). Defendants are the members of the Composite State Board of Medical Examiners and the Joint Secretary of the State Examining Boards. Plaintiff's dispute with the defendants arises from his desire to use the letters "M.D." after his name in all his professional documents, stationery, telephone listings, etc. Plaintiff has attacked the Georgia statutes which prohibit him from using the designation "M.D.", charging that those statutes deprive him of his constitutional rights of freedom of speech, due process, and equal protection. Jurisdiction is based on 28 U.S.C. § 1343(3) and (4).

## BACKGROUND

The background of the development of osteopathy and its relation to allopathy is interesting and helpful to a full understanding of Dr. Oliver's situation. Allopathy refers to medicine as it is practiced by M.D.'s and as it is taught in the medical schools awarding the M. D. degree. Osteopathy was founded by Andrew Taylor Still, M.D. (1828–1917) who in the course of his practice as a 19th Century Missouri physician developed theories regarding the functioning of the human body and the causes of disease and abnormalities. He held that abnormalities of the skeletal, muscular and ligamentous tissues, especially of the spinal column, resulted in interferences with normal nerve and blood supply and involved reciprocal relationships among all organs. From this concept, Still worked out a system of manipulations intended to realign functional deviations and abnormalities. Still's success in treating patients gained him a following for his teachings. Schools of osteopathy were established around the country and a national organization, called first the Association for the Advancement of Osteopathy and then in 1901 the American Osteopathic Association, was founded. There are at present about six schools of osteopathy in this country.

Although, as originally propounded by Still, osteopathy was chiefly a drugless, non-surgical therapy, with emphasis on physical manipulation, the use of drugs and the practice of surgery were not excluded; later, they became a more and more important part of osteopathic practice. At the present time the differences between schools of osteopathy and schools of allopathy are minor. The two types of schools offer the same basic curricula and use the same texts. Osteopathic schools do, however, offer and require courses in the history, principles and practice of osteopathy and manipulation. Many allopathic schools now offer courses similar to manipulation, under the course description of physical therapy or biomechanics. Schools of osteopathy differ from schools of allopathic medicine most significantly in that, with one exception, they are not affiliated with large universities. Traditionally, schools of osteopathy have placed must less emphasis on medical research. Great emphasis in osteopathic education

has been placed on the areas of family and community health, and preventive medicine.

In recent years, especially since 1969, the American Medical Association has sought greater contacts with osteopathy and osteopaths. Osteopaths are welcome in A.M.A.-approved internships and residencies, and medical schools are permitted to grant M.D. degrees to D.O.'s who have successfully completed such programs. Local medical associations are allowed to accept osteopaths as members and such osteopaths are then eligible for membership in the A.M.A. In fact, the A.M.A. was at one point urging the amalgamation of osteopathy and allopathy; the amalgamation proposal was unacceptable, however, to the American Osteopathic Association.

Based on the testimony given at the hearing and the evidence submitted to the court, it seems to be the general consensus that post-World War II graduates of osteopathic schools are equally as well qualified in medicine as graduates of allopathic schools. For example, Dr. Walter C. Bornemeier, M.D., immediate past president of the A.M.A., testified as follows: "I would say that the modern graduate of an osteopathic school is probably no different in his capabilities and in what he is permitted to do than the allopath."

The recent acceptance of the practice of osteopathy has been reflected in Georgia law. Prior to 1970, the State had separate licensing systems for osteopaths and allopaths. The State Board of Osteopathic Examiners was responsible for licensing osteopaths, upon successful completion of an osteopathic examination, but was empowered to grant only licenses which were limited to some extent. In 1970 the Composite State Board of Medical Examiners was established, composed of both M.D.'s and D. O.'s. This Board administers a single examination to both osteopaths and allopaths; upon successful completion of the examination and the other prerequisites, both D.O.'s and M.D.'s are given a

full license to practice medicine. As part of the reform of the medical licensing system, osteopaths holding limited licenses were allowed to receive full licenses upon completion of a postgraduate program approved by the Composite State Board.

Despite official recognition of osteopathy by the state, it is clear that the general public of the State of Georgia is unfamiliar with the terms "osteopath", "osteopathy", an "D.O." To some extent this unfamiliarity is a result of the comparatively few osteopaths practicing in this state.

FACTS

Dr. Oliver's competence as a physician has been established by evidence and has not been challenged by defendants. He graduated from a school of osteopathy in 1960, successfully completed an osteopathic internship and then engaged in the private practice of osteopathy in Michigan and Texas for about five years. After serving as a general medical officer in the United States Navy plaintiff began a period of about five years of training in A.M.A.-approved programs. Most recently, he successfully completed in 1971 an A.M.A.-approved residency in obstetrics and gynecology at the Crawford W. Long Hospital, Atlanta, Georgia, which is owned by Emory University and operated by Emory University Medical School. He is a Junior Fellow of the American College of Obstetrics and Gynecology. The certificate of successful completion of the Crawford W. Long residency and the certificate of membership in the American College of Obstetrics and Gynecology both originally contained the letters "M.D." following plaintiff's name. Neither certificate contained the designation "D.O." At some point new certificates were issued in which plaintiff was designated as a "D.O."

In 1972 plaintiff moved to Eastman, Georgia, and commenced his medical practice, specializing in obstetrics and gynecology. It was at this time that

plaintiff began to hold himself out to the public with the designation "M.D." after his name on stationery, prescription blanks, and similar public listings. Plaintiff ceased to hold himself out as an "M.D." after defendant C. L. Clifton, Joint Secretary, State Examining Boards for the State of Georgia, informed hospital officials of the Dodge County Hospital, Eastman, Georgia, that plaintiff's holding himself out in this manner was in violation of Georgia law.

## PLAINTIFF'S ALLEGATIONS

Plaintiff is attacking the statutory scheme which prohibits him from holding himself out as "M.D." In particular, he challenges as unconstitutional on its face and as applied Ga.Code Ann. § 84–907.2 which provides:

> On all licenses issued by the board after the passage of this section the board shall enter after the name of the licensee the degree to which the licensee is entitled by reason of his diploma of graduation from a professional school in good standing with the board.

Plaintiff also attacks the constitutionality of Ga.Code Ann. § 84–907.3, which requires a licensed physician to use in his public listings, stationery, etc. the degree to which he is entitled by reason of his diploma of graduation from a professional school in good standing with the board.[1] An attack is also made on Ga.Code Ann. § 84–901, as amended in 1971, effective date July 1, 1973, the final paragraph of which provides that the terms "doctors of medicine", "licens-

ed doctors of medicine", "doctors of medicine licensed to practice in the State", and similar terms shall mean only those persons who hold the degree of Doctor of Medicine (M.D.).[2] It is undisputed that the challenged statutes do make it unlawful for plaintiff or any other D.O. to hold himself out to the public as an M.D. and further, it is undisputed that plaintiff's calling himself "M.D." throughout most of 1972 constituted a violation of Ga. Code Ann. § 84–907.3.

Plaintiff contends that these statutes deprive him of the freedom of speech guaranteed by the First Amendment, in that they prohibit him from referring to himself as "M.D." It is also contended that the statutes deprive him, without due process, of his property right to designate himself as an "M.D." His most substantial arguments are based on the Equal Protection Clause of the Fourteenth Amendment. He contends that there is no rational basis for the differentiation between D.O.'s and M.D.'s in that the two terms are functional equivalents. Secondly, he argues that the statute is unconstitutionally applied to him in that foreign doctors, many of whom do not have the degree of Doctor of Medicine or M.D., are nonetheless designated "M.D." on their licenses and are permitted to use the initials "M.D." in all their professional correspondence and listings.

## DEFENDANTS' MOTIONS

Defendants have moved to dismiss the complaint. They contend that the court lacks jurisdiction in that a State cannot be sued in federal court un-

---

1. Ga.Code Ann. § 84–907.3—A licensee under this Chapter shall, in any letter, business card, advertisement, prescription blank, sign, or public listing or display of any nature whatsoever, designate the degree to which he is entitled by reason of his diploma of graduation from a professional school in good standing with the board.

2. Ga.Code Ann. § 84–901, the final paragraph of which, as of July 1, 1973, reads as follows:
   Provided, however, that the terms "doctors of medicine," "licensed doctors

of medicine," "doctors of medicine licensed to practice in the State" and similar terms wherever used in this Chapter or elsewhere shall mean and include only those persons who have graduated from a medical college and hold the degree of Doctor of Medicine and who are licensed to practice medicine under the provisions of this Chapter.

less the State has waived its sovereign immunity. This argument is easily disposed of by reference to Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L. Ed. 714 (1908).

Defendants also seek to have the three-judge panel dissolved on the ground that a substantial constitutional claim has not been presented. This motion too must be denied. Defendants are of course correct in stating that a three-judge panel is not required if the constitutional claims presented are not substantial. That rule has often been invoked when prior decisions, especially decisions of the Supreme Court, conclusively dispose of the issue presented. *See* Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); Glisson v. Mayor and Councilmen of Town of Savannah Beach, 346 F.2d 135 (5th Cir. 1965). In the present case plaintiff has presented legal arguments never previously resolved by any court. This court is always hesitant to dismiss novel constitutional arguments without due consideration. *See* Cook & Nichol, Inc. v. Plimsoll Club, 451 F.2d 505, 506 (5th Cir. 1971). Plaintiff's equal protection arguments raise issues which are sufficiently substantial to require consideration by a panel of three judges.

Defendants have also moved for summary judgment. The court will, however, decide this case on the basis of all the live testimony, depositions, affidavits and exhibits.

## THE EQUAL PROTECTION CLAIMS

Plaintiff contends that the statutory scheme is unconstitutional in that it differentiates between osteopaths and allopaths when there is no rational basis for the differing treatment. It is argued that the statutes in question set up two classes of fully licensed physicians—M. D.'s and D.O.'s. However, the court notes that the two classifications have been set up not by the State but by the two kinds of medical schools in this country and the two professional medical associations which monitor and control the schools. Upon graduation from med-

ical school, physicians fall into two categories; the State merely recognizes as valid and therefore perpetuates the classification which has been made by the professional schools by means of the degrees conferred. The evidence indicates that the osteopathic schools could grant M.D. degrees instead of D.O. degrees but for the policy of the American Osteopathic Association which forbids them from doing so. Apparently, if the osteopathic schools did offer the M.D. degree and if the schools continued to be approved by the Composite State Board, the defendants would recognize that M. D. degree and grant a license which bore the designation M.D.

Despite the fact that the distinction is not created by the State, the recognition and perpetuation of the classifications by the defendants is significant. There is sufficient State involvement here to subject the defendants' actions to Fourteenth Amendment scrutiny.

In order to withstand equal protection scrutiny the statutory scheme here under review must bear a reasonable relation to a legitimate state purpose. Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972). The State has broad powers to regulate businesses and professions within its boundaries, especially when the profession deals so directly with the health and welfare of the people of the State. The State can thus exclude from the practice of medicine those whom it finds not to be qualified and can set the standards for qualification. England v. Louisiana State Board of Medical Examiners, 246 F.Supp. 993 (E.D.La.1965); see also Stephens v. Dennis, 293 F.Supp. 589 (N.D.Ala.1968).

With regard to the specific statutory provisions here under attack, the State is legitimately interested in assuring that the public have at least some of the information necessary to make an informed judgment in choosing a physician. Plaintiff has not asserted that the State has no valid interest in this area; rather, it is plaintiff's contention that the means employed by the statute is not

reasonably related to the State's admittedly valid purpose. The essence of plaintiff's argument is that the terms "D.O." and "M.D." do not reflect any substantial difference between allopaths and osteopaths and that the differing designations merely confuse rather than enlighten the public.

The court finds, however, that there are meaningful distinctions between D.O.'s and M.D.'s. In this connection it should be made quite clear that in so finding the court does not make any judgment as to the relative merits of osteopathy and allopathy. As we have said before, the evidence presented to us indicates that recent graduates from osteopathic schools are, on the whole, equally as qualified as graduates of allopathic schools. This is the official position of the American Medical Association. The position of the American Osteopathic Association is that osteopathic education is in some respects superior to allopathic, that osteopaths make a discrete contribution to medicine in this country and that osteopathy should not, for those reasons, be merged into allopathy.

One valid distinction between these two types of physicians deals with the kinds of treatment which they provide. Dr. Hassie H. Trimble, D.O., a defendant and a member of the Composite State Board of Medical Examiners, testified that he uses manipulative therapy in his practice and that, in his opinion, many D.O.'s employ manipulation. He further testified that some patients come to him specifically for manipulative therapy and that he has had patients who prefer D.O.'s to M.D.'s. As the allopathic medical schools have become more oriented toward research, osteopathy, with its emphasis on family and community health and preventive medicine, has served a vital need.

■ The State's requirement that physicians hold themselves out to the public under the professional degree which they have received is thus a rational requirement in light of the evidence that some D.O.'s offer manipulative treatment and that some patients seek out and prefer D.O.'s for this or other reasons. The designation of the degree D.O. or M.D. thus helps the public in choosing a physician.

But plaintiff contends that the statute does not serve that purpose, at least in Georgia, because the majority of people in Georgia are unfamiliar with the term "D.O." Plaintiff has supported this assertion with a survey which indicates that over 90% of the adults in Georgia either realize that they do not know what the term "D.O." means or are incorrect in their understanding of its meaning. The fact that the people of Georgia are ignorant of the meaning and qualifications of D.O.'s is not the fault of the State or of defendants. This is a problem of public relations which must be overcome by osteopaths themselves and their organization, the A.O.A.

■ In sum, while osteopaths and allopaths are both fully licensed and competent physicians, there are differences between them which make it rational for the State to require physicians to hold themselves out to the public and to be licensed with the letters of the degree which they have been awarded.

In the second aspect of his equal protection argument the plaintiff compares himself to foreign-trained physicians licensed to practice in Georgia and contends that the State has arbitrarily differentiated between the two. The court agrees.

There are about 900 physicians licensed to practice medicine in Georgia who obtained their professional medical training in countries other than the United States. These foreign-trained physicians each received licenses with the letters "M.D." following the name of the licensee. In many cases, the actual degree awarded to the licensee by the school attended was not, in its original language or as translated, an M.D. degree, if indeed it was a degree. In many cases, the document given the

graduate of a foreign medical school is not a degree but simply a license to practice medicine. Foreign physicians licensed to practice in Georgia are permitted to use, and do use, the letters "M.D." following their names in public communications of diverse nature and no disciplinary action has ever been taken against them by the Composite State Board of Medical Examiners on the basis of such use.

■ The statutory scheme for the licensing of physicians makes no specific provision for the licensing of foreign-trained physicians. The statutory requirement that all licenses issued by the Composite State Board of Medical Examiners bear the degree to which the licensee is entitled by reason of his diploma of graduation from an approved school contains no exceptions. Defendants contend that their issuing an "M. D." license to foreign-trained doctors is a reasonable interpretation of the statute. It appears to this court that defendants' actions in this regard may well be in violation of Ga.Code Ann. § 84–907.2. We need not, however, expressly make such a finding, for it is clear that their actions constitute a violation of Dr. Oliver's rights to equal protection of the laws.

Defendants attempt to justify on two grounds the licensing of foreign physicians with the letters "M.D." even where the foreign physicians have not been awarded an M.D. degree (or a degree which translates directly into "Medical Doctor" or "Doctor of Medicine"). First, they contend that the degrees, or certificates, of the qualified foreign-trained physicians are substantially equivalent to an M.D. degree. Second, they contend that the degrees or certificates of the qualified foreign-trained physicians have no meaning or significance to most people in Georgia. Thus it is argued that the State's interest in informing the public about the qualifications and training of physicians practicing in Georgia is best served by licensing all foreign-trained physicians by denominating them "M.D."

These arguments are almost identical to Dr. Oliver's arguments in favor of his being permitted to call himself "M.D." The terms "M.D." and "D.O." are substantially equivalent, and many if not most people in Georgia are not aware of the significance of the term "D.O." While the court has held that the State can validly require a physician to hold himself out under the degree which he has been awarded, and no other, the State cannot differentiate between two qualified physicians who have *not* earned an M.D. degree and allow one to parade under an unearned M.D. degree while refusing to allow the other to do so. The State has failed to show the court any reasonable basis for its differing treatment of foreign-trained physicians and D.O.'s. The two are similarly situated; without a rational basis for the distinction, the State's differing treatment of foreign-trained physicians and D.O.'s is arbitrary and in violation of the Equal Protection Clause. Defendants are enjoined from refusing to grant plaintiff a license bearing the designation "M.D.", so long as they grant M.D. licenses to foreign-trained physicians who do not have M.D. degrees. In addition, defendants must be enjoined from selectively enforcing Ga.Code Ann. § 84–907.3 regarding the use of the designation "M.D." in public listings, etc.

### FIRST AMENDMENT AND DUE PROCESS ARGUMENTS

Plaintiff has also raised a freedom of speech argument against the statutory scheme. Plaintiff contends that he has been denied freedom of speech by defendants' refusal to allow him to refer to himself as an "M.D." This argument is without merit.

■ An essential element of plaintiff's First Amendment claim is his factual assertion that the term "M.D." has become a generic term which signifies a competent physician rather than the academic degree Doctor of Medicine. As evidence of this contention plaintiff has submitted into evidence a survey which indicates that approximately 70% of

adult Georgians have the opinion that "M.D." signifies an occupation rather than an academic degree. The meaning of a term cannot be determined by the opinion of a majority of a random sample. The fact remains that at least in professional and academic circles the term "M.D." signifies that one has received that academic degree. ˋPlaintiff's First Amendment rights are not violated by the State's refusal to allow him to hold himself out to the public under a degree which he has not earned. See Drew Co. v. Federal Trade Commission, 235 F.2d 735, 739–740 (2nd Cir. 1956), cert. denied 352 U.S. 969, 77 S.Ct. 360, 1 L.Ed.2d 323.

Plaintiff's due process claim is based on an assertion that defendants are depriving him of his property right to designate himself as an "M.D." In light of the above discussion it is clear that plaintiff has been unable to show the court any right to hold himself out under the designation "M.D."

### CONCLUSION

In conclusion, the court notes that plaintiff's real dispute seems to lie not so much with defendants as with the American Osteopathic Association, which refuses to allow amalgamation of osteopathy with allopathy, and with the school from which he graduated, which did not grant him an M.D. degree. Plaintiff has referred to hostility from the Georgia Medical Association and from M.D.'s in the area in which he practices. In this connection it seems that the national policy of the A.M.A. urging cooperation with D.O.'s has not been fully accepted at the local level. There is no allegation or proof that defendants have promoted or caused the hostility. If osteopathy is to remain a separate branch of medical science, as the A.O.A. wishes, then it seems that osteopaths need to educate the public to their qualifications and training. These problems are well beyond the reach of this court.

Accordingly, defendants are hereby permanently enjoined from refusing to grant plaintiff a license with the designation M.D., so long as they grant licenses with the designation "M.D." to foreign-trained physicians who do not have an M.D. degree. Defendants are further permanently enjoined from enforcing Ga.Code Ann. § 84–907.3 against the plaintiff so long as they do not enforce the statute against foreign-trained physicians who do not have an M.D. degree. For purposes of this injunction, all foreign degrees which translate directly into English as Medical Doctor, Doctor of Medicine, or degree of Doctor of Medicine are considered to be M.D. degrees. It is further ordered and adjudged that in all other respects plaintiff's claims for relief are denied, each side to bear his own costs.

It is so ordered.