STATE BOARD OF REGISTRATION
FOR THE HEALING ARTS,
Appellant,

v.

Lawrence E. GIFFEN, D.O., Respondent.

No. 64132.

Supreme Court of Missouri,
En Banc.

May 31, 1983.

David Brydon, Stephen G. Newman, Jefferson City, for appellant.

Dale C. Doerhoff, Jefferson City, for respondent.

WELLIVER, Judge.

The question in this case is whether appellant's practice of licensing as doctors of medicine (M.D.'s) those foreign medical graduates whose medical degrees do not reasonably translate into that designation denies doctors of osteopathy (D.O.'s) their right to equal protection of the laws. For the reasons that follow, we hold that it does not.

## I

### A

Osteopathy is a theory of medicine. It differs from the more traditional concept of allopathic medicine in that it places a greater emphasis on the role that the structural harmony of the human body plays in the prevention and cure of disease. Underlying the theory of osteopathy are the principles that the body is an integrated whole in which no part functions independently; that because of a complex system of checks and balances the body tends to be self-regulating and self-healing in the face of stress and disease; that the neuromusculoskeletal system is important in the body's continuous effort to resist and overcome illness and disease; and that the forces of the nervous and circulatory systems must be properly integrated in order for all body organs and systems to function adequately. As originally envisioned,[1] "osteopathy was chiefly a drugless, nonsurgical therapy, with emphasis on physical manipulation." *Oliver v. Morton*, 361 F.Supp. 1262, 1264 (N.D.Ga. 1973). The manipulative procedures were developed "to correct structural abnormalities and restore body harmony, on the theory that given structural normality, the body had its own resources to combat disease." 1 *Lawyers' Medical Cyclopedia* § 1.19, at 39 (3d ed. 1981).

Today the use of drugs and surgery has become "more and more [an] important part of osteopathic practice" so that the differences between osteopathic and allopathic schools of medicine are "minor." *Ol-*

---

1. Osteopathy was first espoused by Kansas physician Andrew Taylor Still in 1874. 1 *Lawyers Medical Cyclopedia* § 1.19, at 39 (3d ed. 1981). Dr. Still later established the first osteopathic medical school at Kirksville, Missouri, in 1892, and in 1894 that school was incorporated in Missouri as the American School of Osteopathy. The school is now known as the Kirksville College of Osteopathic Medicine.

*iver,* 361 F.Supp. at 1264.[2] That is not to imply, however, that the differences are insignificant. One important difference lies in the instruction given in manipulative theory and technique. The American Osteopathic Association, the sole accrediting authority for the fourteen schools of osteopathic medicine,[3] requires for accreditation that osteopathic schools provide within their curricula mandatory courses in osteopathic philosophy and concepts and in manipulative theory and treatment. Consequently, as the parties have stipulated, the "knowledge of manipulative therapy is available as a diagnostic and therapeutic [technique] for any osteopathic physician to apply." The same is not true for graduates of allopathic medical schools. Osteopathic manipulative theory and treatment are not taught at allopathic schools, although some allopathic schools now offer somewhat similar courses under the description of physical therapy or biomechanics.

## B

Respondent received his D.O. degree from the Kirksville College of Osteopathy and Surgery,[4] a medical school approved and accredited by the American Osteopathic Association, in 1945. He does not hold an M.D. degree.[5] Respondent is licensed as a D.O. to practice medicine in Missouri, and he maintains an office in Jefferson City. For approximately four years before commencement of the present litigation, respondent, knowingly in violation of § 334.-047(2), RSMo 1978,[6] used the designation

2. For example, similar courses with similar content are taught at both allopathic and osteopathic medical schools, and students at both schools take the same number of hours in the basic sciences and clinical work. *Eatough v. Albano,* 673 F.2d 671, 673 (3d Cir.), *cert. denied,* 457 U.S. 1119, 102 S.Ct. 2931, 73 L.Ed.2d 1331 (1982). The two schools use the same textbooks. *Oliver,* 361 F.Supp. at 1264. One difference between the schools is that, with one exception, osteopathic schools are not affiliated with large universities. *Id.* Osteopathic schools place less emphasis on medical research and more emphasis on family and community health and preventive medicine. *Id.* at 1264–65. Osteopathic physicians are permitted to undergo internships and residency programs approved by the American Medical Association, and they are not permitted to join both the AMA and local medical organizations. *Id.* at 1265.

3. The parties have stipulated that there are no schools of osteopathic medicine outside the United States. Respondent testified at his deposition that there are "several" osteopathic schools in England but that they are not true medical schools: "They're not approved by the American Osteopathic Association because they're—they're really—they just teach manipulation. They're really not full physicians.... I don't think [graduates of those schools] could possibly be licensed as physicians in the United States."

4. The school is now known as the Kirksville College of Osteopathic Medicine. *See supra* note 1.

5. The degree of "M.D.," signifying "medical doctor" or "doctor of medicine," is conferred by American schools of allopathic medicine and by some foreign medical schools.

6. Section 334.047, RSMo 1978, provides:

*334.047. License to show degree held by licensee—use on stationery and displays required.*—1. On the licenses issued by the board, the board shall enter after the name of the licensee the degree to which the licensee is entitled by reason of his diploma of graduation from a professional school approved and accredited as reputable by the American Medical Association and approved or accredited as reputable by the American Osteopathic Association.

2. A licensee under this chapter shall, in any letter, business card, advertisement, prescription blank, sign, or public listing or display of any nature whatsoever, designate the degree to which he is entitled by reason of his diploma of graduation from a professional school approved and accredited as reputable by the American Medical Association or approved and accredited as reputable by the American Osteopathic Association.

The statute was amended in 1981. Act of June 30, 1981, sec. A, § 334.047, 1981 Mo.Laws 453, 521–22 (codified at § 334.047, RSMo Supp. 1982). The amendment reenacted the first two subsections in substantially the same form, adding the Liaison Committee on Medical Education as an accepted accrediting organization. The amendment also added a new subsection (3) relating to licensure of foreign medical graduates. The amended statute provides:

*334.047. License to show degree held by licensee—use on stationery and displays required.*—1. On the licenses issued by the board, the board shall enter after the name of the licensee the degree to which the licensee is entitled by reason of his diploma of graduation from a professional school approved and accredited as reputable by the American Medical Association or the Liaison Commit-

"M.D.," rather than "D.O.," in the telephone directory, on his office door, and on his stationery, statements, prescription order blanks, and all other documents. In short, according to his own testimony, respondent universally represented himself to be an M.D. rather than a D.O.

Appellant is the state agency charged with "registering, licensing and supervising all physicians and surgeons" in Missouri. § 334.120, RSMo 1978; § 334.120(1), RSMo Supp. 1982. In 1979 appellant brought this action to enjoin respondent from using the M.D. designation and to compel him to use the D.O. designation for all purposes. In his answer respondent alleged as an affirmative defense that § 334.047 was unconstitutional as applied because appellant's policy of licensing as M.D.'s foreign medical graduates not granted that degree breached respondent's right to equal protection of the laws under U.S. Const. amend. XIV, § 1, and Mo. Const. art. I, § 2. Respondent also alleged that § 334.047 was unconstitutional because it constituted a special law prohibited by Mo. Const. art. III, § 40(28). In addition, respondent filed a counterclaim in which he reasserted his constitutional allegations and requested the trial court to enjoin appellant from licensing as M.D.'s those foreign medical graduates not entitled to use that designation by reason of their diplomas from medical schools approved and accredited by the American Medical Association.

The trial court ruled for appellant on its petition to enjoin respondent from using the designation "M.D." Respondent has not appealed that decision. The trial court ruled for respondent on his counterclaim, finding that appellant's licensure of foreign medical graduates whose degrees do not translate into "M.D." violates respondent's right to equal protection of the laws. It enjoined appellant from licensing as an M.D. any medical graduate whose diploma confers neither that degree nor one that "reasonably translates to 'M.D.' or 'Doctor of Medicine,'" and it ordered appellant to recall the M.D. licenses of those physicians not entitled to such and to issue them new licenses consistent with the terms of the decree. It is that portion of the ruling that has been appealed. The case was transferred prior to opinion by the Missouri Court of Appeals, Western District, on the jurisdictional ground that because respondent challenges the constitutionality of a state statute, the case is within the exclusive appellate jurisdiction of this Court. *Id.* art. V, § 3. We review the case as if it were on original appeal, Rule 83.09, and we reverse that portion of the judgment that has been appealed.

## II

■ Respondent's equal protection complaint rests upon the fact that appellant allows use of the M.D. designation by foreign medical graduates who do not possess an M.D. degree but disallows its use by D.O.'s such as respondent who similarly do not possess an M.D. degree.[7] The record contains numerous exhibits, considerable

---

tee on Medical Education or approved and accredited as reputable by the American Osteopathic Association.

2. A licensee under this chapter shall, in any letter, business card, advertisement, prescription blank, sign, or public listing or display of any nature whatsoever, designate the degree to which he is entitled by reason of his diploma of graduation from a professional school approved and accredited as reputable by the American Medical Association or the Liaison Committee on Medical Education or approved and accredited as reputable by the American Osteopathic Association.

3. On licenses issued by the board to foreign trained licensees, the board may enter the degree to which the licensee is entitled based upon the nature of the licensee's edu-

cation and training and the licensee shall, in any writing or display, so designate this degree.

§ 334.047, RSMo Supp.1982.

7. This practice is now specifically authorized by statute. § 334.047(3), RSMo Supp.1982. *See supra* note 6. Appellant contends that respondent's equal protection claim was rendered moot by the enactment of that subsection after this litigation was begun. We disagree. That subsection codifies appellant's existing practice of licensing foreign medical graduates according to the nature of their education and training. If that practice is invalid because it works an impermissible discrimination, legislative sanction of that practice cannot validate it.

testimony, and the stipulation of the parties regarding the educational qualifications of graduates of foreign and domestic allopathic medical schools vis-a-vis those of graduates of osteopathic medical schools. It is unnecessary to set forth that evidence here. Respondent has not appealed the trial court's ruling that he must designate himself a D.O. rather than an M.D. and therefore does not challenge the distinction between graduates of osteopathic schools and graduates of domestic allopathic schools that is codified in § 334.047(1)–(2).[8] He challenges only the practice of allowing foreign medical graduates to employ the M.D. designation. As regards foreign graduates it suffices to say that every physician licensed in Missouri must pass the same examination or one equivalent to it.[9] Respondent does not, and indeed could not, contend that appellant licenses as M.D.'s foreign medical graduates who have not demonstrated their competence to practice medicine. Respondent's claim is simply that it is unconstitutional to distinguish between similarly qualified graduates of osteopathic schools and foreign medical schools.

A

■ The first step in addressing respondent's equal protection claim is to determine whether the challenged classification "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny." *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973). *See United States v. Carolene Prod-*

*ucts Co.,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783–84 n. 4, 82 L.Ed. 1234 (1938). If the classification neither burdens a suspect class nor impinges upon a fundamental right, the only issue to be considered is whether the classification is rationally related to a legitimate state interest. *Friedman v. Rogers,* 440 U.S. 1, 17, 99 S.Ct. 887, 898, 59 L.Ed.2d 100 (1979); *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976); *State v. Bolder,* 635 S.W.2d 673, 682 (Mo. banc 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983).

■ No fundamental right is at stake here. The Supreme Court has expressly declined to decide whether doctors have a constitutional right to practice medicine, *Singleton v. Wulff,* 428 U.S. 106, 113, 96 S.Ct. 2868, 2873–74, 49 L.Ed.2d 826 (1976) (plurality), but it has said that in any event "there is no right to practice medicine which is not subordinate to the police power of the States," *Lambert v. Yellowley,* 272 U.S. 581, 597, 47 S.Ct. 210, 214, 71 L.Ed. 422 (1926). Similarly, this Court has said that "there can be no such thing as a vested right in the practice of medicine." *State v. Davis,* 194 Mo. 485, 501, 92 S.W. 484, 489 (1906). Any right there might be to practice medicine certainly does not fall within the high category of rights held to be fundamental, such as freedom of speech and freedom of the press, *Lovell v. Griffin,* 303 U.S. 444, 450, 58 S.Ct. 666, 668, 82 L.Ed. 949 (1983), freedom of religion, *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940), the right to vote, *Reynolds v. Sims,* 377 U.S. 533, 561–62, 84

---

8. Section 334.047(1)–(2) provides that graduates of schools accredited by the specified organizations are to be licensed and designated according to the degrees to which they are entitled by reason of their diplomas of graduation. *See supra* note 6. The accrediting organizations named in the statute do not accredit medical schools outside the United States.

9. Physicians may be licensed in Missouri either by examination or by reciprocity. Candidates for licensure by examination pursuant to 4 C.S.R. 150–2.010 (1982) must generally take the Federation Licensing Examination (FLEX).

Upon a proper showing, however, appellant may accept in lieu thereof the results of the appropriate National Board examination. 4 C.S.R. 150–2.010(5) (1982). Physicians seeking licensure by reciprocity pursuant to 4 C.S.R. 150–2.030 (1982) must "have been successfully examined by any professional board considered competent" by appellant, must have "received grades not less than those required" by appellant, and must already be licensed as a physician and surgeon in another state, the District of Columbia, or a territory of the United States. 4 C.S.R. 150–2.030(5) (1982).

S.Ct. 1362, 1381–82, 12 L.Ed.2d 506 (1964), and the right to procreate, *Skinner v. Oklahoma,* 316 U.S. 535, 536, 62 S.Ct. 1110, 1111, 86 L.Ed. 1655 (1942). The practice of medicine therefore is not a fundamental right. *Cf. Younger v. Colorado State Board of Law Examiners,* 625 F.2d 372, 377 n. 3 (10th Cir.1980) (practice of law not a fundamental right). "*A fortiori,* the 'right' to use a particular professional designation is not fundamental." *Maceluch v. Wysong,* 680 F.2d 1062, 1065 (5th Cir.1982).

■ Neither does the challenged classification burden a suspect class. Classifications based upon alienage are, of course, suspect. *Graham v. Richardson,* 403 U.S. 365, 371–72, 91 S.Ct. 1848, 1851–52, 29 L.Ed.2d 534 (1971). The classification at issue here, however, is based not upon alienage "but ... upon the locality of the education received. Substantial numbers of Americans attend medical schools abroad, just as some foreigners attend medical schools in the United States." *Maceluch,* 680 F.2d at 1065. Because the challenged classification neither affects a fundamental right nor burdens a suspect class, the rational relationship standard is the proper one by which to assess its constitutionality. *See id.; Eatough v. Albano,* 673 F.2d 671, 676–77 (3d Cir.), *cert. denied,* 457 U.S. 1119, 102 S.Ct. 2931, 73 L.Ed.2d 1331 (1982); *Oliver,* 361 F.Supp. at 1267.

**B**

■ Osteopathic training in manipulative theory and treatment has been upheld as a proper basis for distinguishing between graduates of osteopathic and domestic allopathic medical schools. The state has a legitimate interest in assuring that members of the general public are able to make an informed and intelligent choice when they seek medical care. Some people prefer, and actively seek, treatment from osteo-

opathic physicians because they offer manipulative therapy. Others, by the same token, avoid such treatment. Use of the M.D. designation by all physicians, including osteopaths, would serve only to confuse, rather than enlighten, the public. The requirement that osteopathic physicians employ the D.O. designation is rationally related to the state's legitimate interest in assisting the public to make an informed and intelligent choice among physicians.[10] *Maceluch,* 680 F.2d at 1066–67; *Eatough,* 673 F.2d at 676; *Oliver,* 361 F.Supp. at 1268. Although

> medicine is practiced within an objective scientific framework, the decisional processes of a physician reflect not only the aggregate of his substantive knowledge of clinical techniques, but also his judgment as to the need for, and nature of, treatment. That skill, born of expertise, perception of human nature, and intuitions as to what is best for a patient, jumps over the many voids in "scientific" knowledge and separates the scientist from the doctor. It follows that two schools of medicine that advocate different approaches, even if they differ only in their advocacy of differing philosophical approaches to the same scientific realities, present a difference that a legislature may note without unlawfully discriminating against one, or preferring one over the other.... The legislature has not caused these differences. It has only required that, because differences exist, they be identified.

*Maceluch,* 680 F.2d at 1066.

■ These considerations also justify the distinction between osteopaths and foreign medical graduates. The two groups of physicians are not necessarily similarly situated. The parties have stipulated that there are no osteopathic medical schools outside the United States. *See supra* note 3. At

10. This is in harmony with the official position of the American Osteopathic Association. In *Maceluch,* the AOA argued as amicus curiae that

> [i]t is already exceedingly difficult for a layman to make an intelligent choice of physicians. To allow physicians trained in osteo-

pathic schools to use the designation, "M.D." would deprive a layman of one of the only methods available of differentiating between physicians. Osteopathic physicians have a unique contribution to make and offer the public a distinct option in health care.
680 F.2d at 1066.

least respondent knows of none whose degree would entitle its graduates to seek licensure as physicians in the United States. *Id.* Compare *Maceluch,* 680 F.2d at 1067 n. 6. Therefore, not all foreign medical graduates, like not all graduates of domestic allopathic medical schools, are trained as are osteopaths in the use of manipulation as a diagnostic and therapeutic technique. If this difference justifies the state's requirement that osteopathic physicians use the D.O. designation vis-a-vis graduates of domestic allopathic medical schools, then it also justifies the requirement that they use the D.O. designation vis-a-vis foreign medical graduates. "What sets [osteopaths] apart from M.D.'s, sets them apart from graduates of foreign medical schools as well." *Id.* at 1068.[11]

▮ Respondent argues, however, that under *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976), we must defer to the trial court's findings of fact and that those findings do not support appellant's claim that the challenged distinction helps eliminate confusion by assisting the public to make an informed and intelligent choice among physicians. That argument is wide of the mark. "States are not required to convince the courts of the correctness of their legislative judgments. Rather, 'those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.'" *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981) (quoting *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979)). Thus, "[w]hether *in fact* the [dis-

tinction] will promote [the stated objective] is not the question: the Equal Protection Clause is satisfied by our conclusion that the ... Legislature *could reasonably have decided* that [the distinction] might foster [more informed selection of medical care]." *Id.* 449 U.S. at 466, 101 S.Ct. at 725.

Our holding comports with the holdings of the federal courts of appeals in *Maceluch* and *Eatough.* See *Maceluch,* 680 F.2d at 1067–78; *Eatough,* 673 F.2d at 677. Only *Oliver,* the one other reported case we have found that has addressed the issue presented here, is to the contrary. The three-judge federal district court in *Oliver* held that the state had failed to demonstrate a "reasonable basis for its differing treatment of foreign-trained physicians and D.O.'s," groups that it found "are similarly situated," and that absent such a showing the state could not "differentiate between two qualified physicians who have *not* earned an M.D. degree and allow one to parade under an unearned M.D. degree while refusing to allow the other to do so." 361 F.Supp. at 1269. We think *Oliver* is unpersuasive, because its premise that osteopaths and foreign medical graduates are similarly situated fails to recognize the valid distinction that we have discussed above.

## C

If because of that distinction the state may constitutionally require osteopaths to designate themselves as D.O.'s, it is immaterial for purposes of this case what designation the state allows foreign medical graduates to employ. Nothing in the record indicates that appellant has licensed any foreign medical graduate as a D.O.[12]

---

11. Respondent contends that because he does not use, and never has used, manipulative therapy in his medical practice the distinction is irrational. We disagree. "[W]hether or not [respondent] actually use[s] manipulative therapy in [his practice] does not affect the constitutionality of the statute as applied to [him]; the state's interest in ensuring accurate information on the schooling of physicians is enough to sustain the statute." *Maceluch,* 680 F.2d at 1067. *See Eatough,* 673 F.2d at 677.

12. That is not to imply that appellant might not do so. Although appellant must license graduates of domestically accredited medical schools according to the degrees they receive, § 334.-047(1), RSMo Supp.1982, appellant is authorized to license foreign medical graduates according to "the degree to which the licensee is entitled based upon the nature of the licensee's education and training," § 334.047(3), RSMo Supp.1982. This authorization reflects the fact that it is the nature of the education and training, and not the degree itself, that is important.

We need not decide, therefore, whether an equal protection violation would arise if appellant licensed as a D.O. a foreign medical graduate who did not possess the qualifications, including equivalent training in the use of manipulative theory and treatment, of a D.O.

## III

Public perception of osteopathy lies at the heart of this case. Aside from the self-imposed additional requirement that osteopaths be trained in manipulative theory and treatment, the education of allopathic and osteopathic physicians is today substantially equivalent. Some persons, however, are unaware of this qualitative educational equivalence. They may confuse osteopaths with nonphysicians such as chiropractors, or they may view the M.D. designation as occupational, rather than academic, in nature and may not know that D.O.'s are in fact physicians. For this reason they may not seek treatment from osteopaths.

We can sympathize with the plight of osteopaths who endure the rigors of medical education and examination only to find themselves the subject of gross misperception by some members of the public. The answer to the problem, however, does not lie in resort to the legal system. The misperception "is not the fault of the State or of [appellant]. This is a problem of public relations which must be overcome by osteopaths themselves and their organization, the [American Osteopathic Association]." *Oliver,* 361 F.Supp. at 1268.

We hold that the challenged distinction is rationally related to the furtherance of a legitimate state interest and, therefore, that it does not violate respondent's right to equal protection of the laws. In holding to the contrary the trial court erroneously declared and applied the law. *Murphy,* 536 S.W.2d at 32.

That portion of the judgment appealed from is reversed.

HIGGINS, GUNN and DONNELLY, JJ., and MAUS, Special Judge, concur.

RENDLEN, C.J., dissents in separate opinion filed.

SEILER, Senior Judge, dissents and concurs in separate dissenting opinion of RENDLEN, C.J.

BILLINGS, J., not sitting.

BLACKMAR, J., not participating because not a member of the Court when cause was submitted.

RENDLEN, Chief Justice, dissenting.

For the reasons following I respectfully dissent. This is a court tried case and our standard of review is determined by Rule 73.01 and the interpretation of that rule as announced in *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). Notwithstanding *Murphy* the majority opinion ignores in large part the findings of fact and conclusions of the trial court and instead of examining the record to determine if the findings are supported by the record makes a de novo review of the evidence. We are required to do otherwise by the holding in *Murphy.* In our appellate review "the decree or judgment of the trial court will be sustained ... unless there is no substantial evidence to support it, [or] unless it is against the weight of the evidence ..." and in the latter instance we should exercise caution and do so only "with a firm belief that the decree or judgment is wrong."

The degree is but a shorthand method of describing the physician's education and training. Most persons understand the meaning of abbreviations for degrees conferred by American medical schools, but they likely would not understand the meaning of abbreviations for all foreign medical degrees. Foreign medical schools grant degrees with a variety of names, such as "M.B.B.S." in Ireland, "Candiate in Medicine" in Norway, and "Licentiate in Medi-

cine & Surgery" in Spain. *Eatough,* 673 F.2d at 677. Licensure of all foreign medical graduates according to the degrees actually conferred upon them undoubtedly would create, rather than reduce, confusion. Licensure of qualified foreign medical graduates as either M.D.'s or D.O.'s thus is rationally related to the state's legitimate interest in assisting the public to make an informed and intelligent choice among physicians.

Turning to the findings of the trial court I submit that an examination of the record which included the sworn testimony, exhibits and stipulation of the parties, amply supports those findings and the trial court's judgment.

Defendant (respondent) is a Doctor of Osteopathy and is registered by the board (appellant) as a physician and surgeon and has been issued a license with the degree abbreviation "D.O." inscribed thereon. The trial court found that while distinctions are drawn between an allopathic school of medicine (which typically confers an M.D. degree on its graduates) and an osteopathic school of medicine (which confers a D.O. degree on its graduates), and that presently differences between the schools of osteopathy and schools of allopathy are minor. The two types of schools offer the same basic curricula and use the same texts. While osteopathic schools offer and require courses in history, principles and practice of osteopathy and manipulation, many allopathic schools now offer courses similar to manipulation under course descriptions of physical therapy and biomechanics. Further, the American Osteopathic Association, as the accrediting authority of the osteopathic schools of medicine in the United States, requires those schools to provide the standard curriculum of subjects taught at allopathic schools of medicine as well as courses of osteopathic concepts, philosophy, manipulative theory and treatment. There are no schools of osteopathy located in any foreign country.

The court found from the stipulation of the parties that:

... the number of persons registered by plaintiff [board] as physicians and surgeons under Chapter 334, RSMo 1978, is 17,969. Of those 13,055 are registered and given the license designation of "M.D." or "Doctor of Medicine." Of those 4,914 are registered and given the license designation of "D.O." or "Doctor of Osteopathy." Of prime importance to this case is the fact that of the 13,055 mentioned above and who have received the board's designation of "M.D." or "Doctor of Medicine," *1,853 are graduates of foreign medical schools.* (Emphasis supplied.)

The question turns on the licensing procedure and the treatment by the board of these 1,853 which I submit impermissibly violates plaintiff's constitutional right.

Continuing with the findings of the trial court, foreign medical schools are not approved and accredited by the American Medical Association (hereafter AMA) or the American Osteopathic Association (hereafter AOA). There is no universal standard as to the degrees awarded by foreign medical school. Indeed the record disclosed that:

... among the graduates of foreign medical schools who have received licenses from plaintiff [board] as physicians and surgeons with the designation "M.D." or "Doctor of Medicine," 909 hold diplomas that *do not* designate the degree conferred as "M.D." *nor do they* contain titles that either directly or loosely translate as "Doctor of Medicine." (Emphasis supplied.)

The court further found that:

... pursuant to stipulation of the parties the court finds that some members of the general public in Missouri understand the letters "M.D." to be an academic degree and to reflect the unique nature of the holder's education and training.

In addition, plaintiff board grants licenses to physicians and surgeons who graduated from foreign schools of medicine and this is done upon submission by graduates of foreign medical schools of satisfactory credentials which indicate to the plaintiff (board) that the license designation reflects the education and training which the licensee has acquired, whereupon the board grants licenses and designates those foreign applicants as "M.D." This licensing procedure is accompanied by a certification from the educational commission for foreign graduates as to the passage of the Educational Commission for Foreign Medical Graduates (ECFMG) examination, visa qualifying examination, English language test and similar requirements. In addition, there is a

requirement for a one year residency program. After review of the application and the accompanying credentials, the plaintiff (board) determines whether satisfactory preprofessional and professional education has been attained. On this the foreign medical graduate is licensed with the title "M.D." As found by the trial court, the shortcoming of this process is that:

> ... there are no universal standards for medical school education [in foreign countries]. Some individual countries do not have standards for medical schools within their borders. As an example, per the *World Directory of Medical Schools* ... medical schools in Mexico and the Philippines have no standard curricula or standard tests. These vary from school to school. 1978 results of the ECFMG examination show wide disparity in the results attained by graduates of foreign medical schools. In 1978, ... 134 of 152 taking the test from the United Kingdom schools passed as did 52 of 53 from Australian schools. However, only 429 of 2,297 from Indian schools passed, 232 of 1,878 from Philippine schools and 667 of 2,292 from Mexican schools. (Emphasis added.)

The court pointed out that "there is no universal standard as to the degree awarded by various foreign medical schools." Great Britain and other United Kingdom countries typically award the degree to their medical graduates of MB, BS, representing the title of Bachelor of Surgery. The title M.D. is not awarded except as an advanced post graduate degree.

The court made the further finding that:

> ... foreign medical school graduates licensed in Missouri are permitted to use, and do use, the letters "M.D." following their names in letters, business cards, advertisements, prescription blanks, signs and public listings and displays and no disciplinary action has ever been taken against them by plaintiff [board] on the basis of such use.

The plaintiff (board)

> ... has never permitted any Doctor of Osteopathy or "D.O." to use the letters "M.D." following his name in letters, business cards, advertisements, prescription blanks, signs and public listings and displays.

In its conclusions the court noted that § 334.047.1 RSMo 1978, in vogue and controlling as to this case requires that the board enter, on all licenses issued "*the degree* to which the *licensee is entitled by reason of his diploma* of graduation" (emphasis supplied) and that is true whether the professional school from which he graduates is accredited and approved by the AMA or AOA. The court correctly concluded that § 334.047.2 RSMo 1978, provides that the licensee shall list and display only the letters (M.D. or D.O.) which is the designation *of the degree* to which he is entitled by reason of his *diploma of graduation.* There can be no question that the trial court was correct in its view that the plaintiff has the power and duty to issue licenses to qualified applicants authorizing them to practice their profession of either medical doctor or doctors of osteopathy. As stated by the majority the State of Missouri is legitimately interested in assuring that the members of the public have information necessary to make informed judgment on choosing a physician. As announced by the Legislature the education degree received by a physician is a matter which persons choosing a physician may reasonably consider and in so requiring, members of the public are provided with information which will assist in making informed judgments when choosing physicians. It bears reemphasis that under § 334.047.2 each graduate of AMA and AOA accredited schools must use the *degree designation* to which he is entitled by reason of his "*diploma of graduation.*" Defendant had been awarded a D.O., the degree earned from his professional school, and accordingly the trial court concluded defendant must use the designation "D.O." However, plaintiff board quite without authority applied a *different standard* to foreign medical graduates and the trial court properly concluded the board had:

... no legal authority to use the different procedure for designating educational attainments on licenses of foreign trained physicians than for designating educational attainments on licenses of domestic trained physicians.

The court added:

... enforcement of § 334.047.2 RSMo 1978, so as to require defendant [respondent] to designate that degree he earned and not to permit defendant to use the designation M.D. [defendant has sought such right] to simply show that defendant's training is the equivalent of one holding an M.D. degree while permitting foreign trained physicians who do not hold "M.D." degree or degrees which readily translate into "M.D." or "Doctor of Medicine" to use the "M.D." designation is a violation of defendant's right to equal protection of laws as guaranteed by the Fourteenth Amendment to the Constitution of the United States and by Article 1 § 2 Constitution of Missouri .... On licenses issued to foreign trained physicians and surgeons, plaintiff may designate the educational degrees actually attained or the English designation to which those educational degrees can readily be translated. Plaintiff may not grant the licensee designation of "M.D." to physicians whose diplomas or degrees do not so state or cannot be readily translated into "Doctors of Medicine" or M.D.[1]

These findings and conclusions of the trial court are supported by the substantial evidence in the record before us and I submit are quite justified under the law.

I concur with the view of the majority that in determining the lawfulness of the discrimination found in this case the proper test is the "rational basis test" see Oliver v.

Morton, 361 F.Supp. 1262, 1264 (N.D.Ga. 1973). However, I submit that respondent was the victim of unequal treatment at the hands of the appellant board. He is a physician holding a license to practice medicine in the State of Missouri. He does not have an M.D. but instead a D.O. degree and the board has taken action to prohibit respondent from using the M.D. designation. The impermissible discrimination occurred when the board, considering 945 other physicians who are foreign trained, but who do not hold M.D. degrees, permitted them to use the M.D. designation. This unequal treatment is the core issue in this cause. *Oliver v. Morton, Id.* passed upon the question of whether discrimination such as that suffered by the respondent passes the *rational basis test* when measured against the equal protection clause of the United States Constitution. There the court applying the rational basis test to facts substantially similar to those at bar, held the conduct of the Georgia Board resulted constitutionally by impermissible discrimination. There Oliver, like respondent here, was a graduate of an osteopathic school of medicine and held a D.O. degree. Oliver, like respondent, was affiliated with the AMA (M.D.) and not the AOA (D.O.) organizations and boards. Similarly Oliver, like respondent, held himself out to be an M.D. The State of Georgia, as does Missouri, had a statute which on its face prohibited a D.O. from using the M.D. designation. The state board of medical examiners of Georgia, as did appellants in this case, licensed foreign medical graduates [hereinafter FMG] as M.D.'s and allowed them to use the designation M.D. even though many did not have the M.D. degree. The court, finding the defendant a victim of unlawful discrimination stated:

While the court has held that the State can validly require a physician to hold

---

1. Witness, John Matthews, M.D., a specialist in internal medicine, had been practicing in Jefferson City since 1951. He described his familiarity with the practice of the defendant, a D.O. with whom he was professionally associated. Defendant served on the staff of two hospitals and in the opinion of Dr. Matthews, the procedures and practices of the defendant and M.D.'s "were very much the same." Further,

Dr. Matthews examined the principles of osteopathic medicine recited in the stipulation of the parties and in his opinion these principles were compatible with the principles of allopathic medicine and not in conflict with the principles practiced by an M.D. There were no separate charting procedures or separate surgical procedures and there were no different standards of practice.

himself out under the degree which he has been awarded, and no other, *the State cannot differentiate between two qualified physicians who have not earned an M.D. degree and allow one to parade under an unearned M.D. degree while refusing to allow the other to do so.* The State has failed to show the court any reasonable basis for its differing treatment of foreign-trained physicians and D.O.'s. The two are similarly situated; without a rational basis for the distinction, the State's differing treatment of foreign-trained physicians and D.O.'s is arbitrary and in violation of the Equal Protection Clause. (Emphasis added.)

The ultimate question is whether there is a legitimate governmental purpose in allowing some non-M.D. physicians to call themselves M.D. while denying other non-M.D. physicians including the respondent the same privilege. The question is one of ultimate fact and not of law. The majority declined to follow the teaching of *Oliver* supra, stating that that decision was "unpersuasive" with this as the suggested rational: "*Oliver* is unpersuasive, because its premise that osteopaths and foreign graduates are similarly situated fails to recognize the valid distinction that we have discussed above." By this the majority is apparently referring to the fact that because there are no schools of osteopathy outside the United States that all foreign trained physicians must necessarily be thrown into the general category of M.D. However, the evidence in this cause was to the contrary and the majority confuses the equal protection argument with the proposition that because there is a difference between D.O.'s and M.D.'s that somehow foreign medical graduates though they have no M.D. degree because of allopathic training must necessarily have an M.D. designation. It is illogical to so conclude, instead, the board is requiring D.O.'s to be designated by the degree they have received and not permitting them to use the designation M.D. Respondent is not permitted such designation though his practice and training is equiva-

lent to one holding an M.D. degree. On the other hand, violative of the equal protection doctrine, the board permits foreign trained physicians, who do not have M.D. degrees and whose practice and training are not equivalent to one holding an M.D. degree, to use the M.D. designation. Unlike the majority, who somehow overlook the depth and severity of this discriminatory practice, the trial court on the basis of the facts before it regarding the education and practice of M.D.'s, D.O.'s and FMG's concluded that the respondent's right to equal protection of the law had been violated and I submit that the findings of fact and conclusions of law are correct and that indeed defendant's rights under the Fourteenth Amendment of the Constitution of the United States and Article 1, § 2 of the Missouri Constitution have been violated.

I would affirm the judgment of the trial court in which it was ordered that the plaintiff board be enjoined from licensing any physician or surgeon with an "M.D." or "Doctor of Medicine" if such person does not hold a diploma of graduation, awarding such degree from a duly accredited medical school located within the United States or from a foreign medical school or a diploma awarding a degree from a foreign medical school which reasonably translates to "M.D." or "Doctor of Medicine" awarded by diploma from such foreign medical school. I further would agree with the trial court that some action should be taken as to licenses issued to persons in the past and who would not under the terms of the decree of the trial court be entitled to such a license but rather than ordering a recall of their licenses (as did the trial court) I would order that each be given notice to show cause why his license should not be withdrawn and a new license issued to such persons with such degree designation as are shown by their diplomas or such designations as may be reasonably translated from their diplomas. This would satisfy the requirements of the State and Federal Constitution.[2]

2. Subsequent to the decision in this case the Legislature amended § 334.047 by adding sub-

paragraph 3. *See* § 334.047(3) RSMo Supp.

For these reasons I would affirm in part the decision of the trial court and remand for further orders consistent with this opinion.

1982. This subparagraph 3 was not in effect and of course not in use at trial or when the decision was rendered below. Though the point was not considered by the trial court, the subsequent (June 1981) action of the Legislature does not control the constitutional question of the alleged discriminatory practice of the board. We agree with the language of footnote No. 7 of the majority opinion that "if that practice is invalid because it works an impermissible discrimination, legislative sanction of that practice cannot validate it."